# IN THE SUPREME COURT OF TEXAS

═══════════

No. 10-0995

═══════════

DR. ERWIN CRUZ, PETITIONER,

v.

ANDREWS RESTORATION, INC. D/B/A PROTECH SERVICES
AND RUDY MARTINEZ, RESPONDENTS AND CROSS-PETITIONERS

v.

CHUBB LLOYDS INSURANCE COMPANY OF TEXAS,
CROSS-RESPONDENT

═══════════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

═══════════════════════════════════════════════════════════

**Argued December 7, 2011**

CHIEF JUSTICE JEFFERSON delivered the opinion of the Court.

A series of storms caused extensive damage to a Dallas home. This led to meetings,

inspections, evaluations, negotiations, and, ultimately, litigation between the homeowner, its insurer,

and the company hired to restore the home. A jury found in the restoration company's favor, and

the trial court rendered judgment against the homeowner and its insurer, jointly and severally. The

court of appeals affirmed in part and reversed in part. Because we disagree with part of the court of

appeals' analysis, we affirm in part and reverse and remand in part the court of appeals' judgment.

## I.    Background

This case has a lengthy factual and procedural history, much of which is irrelevant to the three questions before us today. One question presents a challenge to the legal sufficiency of the evidence supporting a jury finding in Andrews Restoration, Inc. d/b/a Protech Services' favor.[1] We review the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We summarize the facts in that light.

### A.    The facts

Dr. Erwin Cruz insured his Dallas home through Chubb Lloyd's Insurance Company of Texas. There were several structures on the property: the home, a cabana, and two garages, one of which had been converted to a wine cellar. After a March 2001 storm, Cruz discovered that multiple roof leaks caused significant water damage throughout the house. Cruz contacted Rudy Martinez, Protech's president, who inspected the home. Cruz signed Protech's work authorization and assignment of insurance benefits, and Protech arranged for mold testing through Afram International. Afram's tests revealed dangerously high levels of mold. Cruz's wife and infant daughter became ill, and, in April, their physician advised that if they did not move out of the house immediately, they could suffer severe medical consequences. The family moved into an apartment the next month.

---

[1] The other two are issues on which the evidentiary record has no bearing.

Protech extracted standing water and removed, cleaned, and stored most of the home's contents. Chubb authorized Protech to perform these services and verbally agreed to pay for them. William Marx, Chubb's adjuster, visited the Cruz home in May and met with Cruz, Adam Hardison (Cruz's attorney), and Martinez. Marx advised that Chubb would conclude its investigation and make a decision on Cruz's claim within thirty days.

When no decision had been reached by July, Hardison wrote Marx, urging Chubb to decide how to proceed with the claim. The letter noted that Hardison had called Marx several times asking when Chubb might complete its investigation, and that "[e]ach time, [Marx] advised that [he was] waiting to hear back from [his] engineers." The letter mentioned the "extreme financial burden" Cruz faced while awaiting Chubb's decision and asked for a prompt resolution. In August, Chubb agreed that Cruz's claims were covered under the policy, but left the damage claim unsettled.

Later that year, with no decision from Chubb, Cruz's representatives (including Protech) advised Chubb that remediating the mold and restoring the home would likely be more expensive than demolishing and rebuilding. Hardison told Chubb that Cruz would prefer demolition to restoration. His letter noted that the claim had been ongoing since March, and that "[t]he time has come to reach a decision on how to proceed." But the claim remained open. Cruz formally demanded policy limits in January 2002.

At the end of January, Chubb responded:

> Please be advised that the [policy limits] demand is neither accepted nor rejected at this time. Although the investigation of the claim as of this date has identified water and ensuing mold damage in some areas, there is no evidence the building, other structure(s), and or contents are a "total loss" and thus require consideration of payment of the respective policy limits. Further investigation,

evaluation, and adjustment activities are required to support a claim under the terms and conditions of the policy of insurance.

In order to move forward with the adjustment of the claim, I propose that we hire a contractor to evaluate and estimate the reconstruction cost of the projected damages resulting from remediation activities to the residence and other structure(s). These estimates could then be used to support the building claim in the adjustment process.

Around the same time, Marx and Hardison met to discuss the claim.[2] Chubb wanted to perform further testing, and it hired David Gregg, a construction expert, to estimate remediation and restoration costs. Chubb agreed it would complete its evaluation by the end of February 2002, but it failed to do so. Hardison testified that even though Chubb decided in January to do additional testing, it took eleven months to complete those tests.

Meanwhile, in April, Gregg recommended first controlling the home's humidity levels—the same recommendation Afram made based on tests it conducted earlier that year. Protech provided a dehumidification cost estimate, which Marx believed was high, but Chubb did not obtain any other estimates. Protech's expert testified that Protech's charges were in line with industry standards. Hardison urged Marx to make a decision and emphasized that any additional testing would merely "reconfirm what had been confirmed almost six months earlier."

In early June, Cruz authorized Protech to begin dehumidification. Later that month, Martinez, Hardison, and Marx met, and Marx promised Protech that Chubb would pay for Protech's services. According to Hardison, Chubb decided to have Protech dehumidify the home so that Chubb would have two options available: either remediate or declare the residence a total loss.

---

[2] Cruz and Martinez may have attended the meeting as well, although the testimony conflicts on that point.

4

Cruz and Hardison were disappointed with Chubb's decision to control the humidity, because the cost of remediation could exceed Cruz's policy limits.

Dehumidification worked, at least initially. By December, the mold levels had been substantially reduced. Because the roof was never repaired, however, water still entered the house when it rained, requiring additional dehumidification. Chubb paid only a portion of Protech's invoices. Martinez retained a lawyer, who sent a March 3, 2003 letter to Marx demanding payment. In response, Chubb paid Protech $250,000. This was the last payment Chubb made to Protech. In June 2003, with Cruz's claim still unresolved, Hardison instructed Protech to stop dehumidifying the home and to remove its equipment. Protech's outstanding invoices totalled $705,548.02.

The reason for the delay in resolving the claim is unclear. There was evidence that Marx was preoccupied with other claims. There was also evidence that Chubb continually sought additional testing and then postponed its performance. Although Marx testified that he authorized a roof repair, Cruz's attorney testified that the offer was never communicated to him, and the roof was never repaired. Chubb ultimately tendered policy limits in November 2003. The home was demolished two years later.

### B. The lawsuit

Protech sued Chubb and Cruz, seeking (as relevant here) breach of contract damages and attorney's fees. Chubb counterclaimed for fraud. Cruz counterclaimed for fraud, fraudulent inducement, negligent misrepresentation, and violations of the Texas Deceptive Trade Practice-Consumer Protection Act.

5

Cruz moved for partial summary judgment on one of his DTPA claims against Protech. He alleged that Protech's work authorizations omitted language mandated by the Property Code. The trial court granted the motion in part, holding that Cruz was a consumer and that Protech committed a false, misleading, and/or deceptive act under the DTPA, but the court declined to grant summary judgment as to any remedy sought by Cruz. In a subsequent order, the trial court found that $1,059,940.52 would be necessary to restore to Cruz all sums that had been paid to Protech by Cruz or on his behalf under the agreements.

The case was tried to a jury, which found that Chubb breached its oral agreement with Protech, that the agreement satisfied the "main purpose" doctrine exception to the statute of frauds, and that Protech's damages were $705,548.02—the amount of its unpaid invoices. Although the jury awarded $25,000 in contingent attorney's fees for an appeal to the court of appeals and $15,000 for an appeal to this Court, the attorney's fee questions did not ask about fees for preparation and trial. The jury also found that Cruz breached his agreement with Protech and awarded the same amounts in damages and attorney's fees as it had against Chubb.

The jury did not find that Protech committed fraud against Chubb or Cruz, or that Protech fraudulently induced Cruz to enter into an agreement, engaged in negligent misrepresentation, or violated the DTPA. Question 29 instructed the jury that the trial court had previously found Protech's failure to include the requisite Property Code language to be a false, misleading, or deceptive act that was a producing cause of injury or harm to Cruz. It then asked what sum of money would reasonably compensate Cruz for his resulting DTPA damages. The jury answered "$0."

6

The trial court rendered judgment on the verdict, awarding Protech $705,548.02 against Chubb and Cruz, jointly and severally, as well as appellate attorney's fees. The trial court ordered that Cruz recover no relief for his Property Code-related DTPA claim, and the court denied Protech's motion for partial new trial on attorney's fees.

All parties appealed, raising numerous issues. In pertinent part, the court of appeals held that despite the trial court's finding that Protech engaged in a deceptive act, Cruz was not entitled to restoration of consideration because Cruz had failed to prove that he was entitled to rescission. The court concluded that Chubb's oral promise to pay Protech was unsupported by consideration and thus barred by the statute of frauds. 323 S.W.3d 564, 574. Finally, the court held that Protech was not entitled to a new trial on attorney's fees, having waived its objection to the trial court's failure to submit a question on attorney's fees for preparation and trial. The court of appeals affirmed in part and reversed and rendered in part the trial court's judgment.[3]

We granted Protech's and Cruz's petitions for review. 54 Tex. Sup. Ct. J. 1548 (Aug. 19, 2011).

## II. Cruz's DTPA claim fails because he is not a prevailing party, and he is not entitled to an order restoring all amounts paid under the contracts without deducting the value received under those agreements.

The Property Code requires that certain contracts for work and materials used to improve a homestead contain a statutory warning, printed in at least 10-point bold type:

IMPORTANT NOTICE: You and your contractor are responsible for meeting the terms and conditions of this contract. If you sign this contract and you fail to meet

_____

[3] The court of appeals also modified the judgment interest rate from 6% to 5%. 323 S.W.3d 564, 583.

the terms and conditions of this contract, you may lose your legal ownership rights in your home. KNOW YOUR RIGHTS AND DUTIES UNDER THE LAW.

Act of April 15, 1993, 73d Leg., R.S., ch. 48, § 4, 1993 Tex. Gen. Laws 97, 98 (amended 2007) (current version at TEX. PROP. CODE § 41.007(a)). Protech's work authorizations and assignment of insurance benefits, which Cruz signed in March 2001 and June 2002, omitted this language.

The Property Code provision is among the "tie-in" statutes actionable under DTPA section 17.46,[4] and a consumer may sue for a violation. Specifically, the DTPA provides:

(a) A consumer may maintain an action where any of the following constitute a producing cause of *[actual damages]*[5] or *damages for mental anguish:*

(1) the use or employment by any person of a false, misleading, or deceptive act or practice that is:

(A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and

(B) *relied on by a consumer to the consumer's detriment.*

TEX. BUS. & COM. CODE § 17.50(a)(1) (emphasis added).

The next subsection lays out the available remedies, one of which is restoration:

(b) In a suit filed under this section, *each consumer who prevails* may obtain:

(1) the amount of [actual damages] found by the trier of fact. . . .;

(2) an order enjoining such acts or failure to act;

---

[4] *See* TEX. PROP. CODE § 41.007 (b) ("A violation of Subsection (a) of this section is a false, misleading, or deceptive act or practice within the meaning of Section 17.46, Business & Commerce Code, and is actionable in a public or private suit brought under the provisions of the [DTPA].").

[5] Because Cruz's claim is predicated on a violation of a tie-in statute, he would be entitled to recover any proven actual damages, rather than just economic ones. *See* TEX. BUS. & COM. CODE § 17.50(h).

> (3)     *orders necessary to restore to any party to the suit any money or property, real or personal, which may have been acquired in violation of this subchapter*; and
>
> (4)     any other relief which the court deems proper . . . .

*Id.* § 17.50(b)(emphasis added).

Cruz argues that, despite the jury's finding that he sustained no damages and the trial court's judgment awarding him no recovery on the claim, he is entitled to the $1,059,940.52 the trial court found had been paid under his agreements with Protech. For several reasons, we disagree.

### A.     Cruz did not prevail on his DTPA claims.

The DTPA authorizes consumer suits when deceptive acts are the producing cause of "[actual damages] or damages for mental anguish." TEX. BUS. & COM. CODE § 17.50(a)(1). The statute permits trial courts to award relief only to a prevailing consumer. *Id.* § 17.50(b). Among those remedies is an order to restore illegally acquired money or property, *see id.* § 17.50(b)(3), and that is the remedy Cruz seeks. But those remedies are unavailable unless a consumer has prevailed.

The jury awarded Cruz no damages on his DTPA claim. He cannot, therefore, satisfy section 17.50(a)(1). The trial court found that Cruz had suffered "injury or harm" but left it to the jury to quantify that amount. We have held that a party who failed to recover actual damages or damages for mental anguish was not entitled to attorney's fees under the DTPA. *See Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 567 (Tex. 2002). We see no reason to treat Cruz's restoration claim differently. Even a rescission award requires a showing of actual damages. *See Russell v. Indus. Transp. Co.*, 258 S.W. 462, 465 (Tex. 1924) (holding that "some pecuniary injury is essential to an action to rescind a contract for fraud"). This is not a case in which Cruz's injury was undisputed but

9

"the jury was not asked to place a monetary value on this injury." *Bonanza Rests. v. Uncle Pete's, Inc.*, 757 S.W.2d 445, 448 (Tex. App.—Dallas 1988, writ denied) (holding that where consumer clearly sustained injury, jury's failure to award damages was not fatal to rescission claim, because jury had not been asked about the particular injury sustained). The statute's clear language provides a cause of action only to consumers who have sustained damages, and the jury awarded Cruz none.

Moreover, under 17.50(a)(1), a consumer loses without proof that he relied to his detriment on the deceptive act. Here, neither the trial court nor the jury found reliance. Cruz's motion for summary judgment was silent on reliance, and the trial court's order states only that Protech and Martinez "committed a false, misleading, and/or deceptive act or practice under the DTPA by not including the required statutory language of Section 41.007(a) of the Texas Property Code in the contracts attached to the Motion . . . which was the producing cause of injury or harm to Cruz."

Similarly, the DTPA question submitted to the jury did not include a reliance element:

> You are instructed that the Court has previously found that the failure of Protech and Rudy Martinez to include the language required by the Texas Property Code conspicuously printed, stamped, or typed in size at least equal to 10 point bold type next to the owner's signature was a false, misleading, or deceptive act, that was a producing cause of an injury or harm to Dr. Cruz. What sum of money, if now paid in cash, would fairly and reasonably compensate Dr. Cruz for his damages, if any, that resulted from such conduct?
>
> Answer in dollars and cents for damages:
> Answer: $0

The relevant Pattern Jury Charge question includes the reliance element,[6] and Cruz included reliance in the jury questions he submitted as to the other section 17.50(a)(1) violation he alleged. Reliance is a necessary element of Cruz's DTPA claim, and he failed to secure a finding on that contested issue. The trial court's order addressed only the elements of section 17.50(a)(1)(A)—that Protech had engaged in a false, misleading, or deceptive act that was the producing cause of harm to Cruz. But the violation is not complete without a finding of reliance under section 17.50(a)(1)(B).

Because the statute authorizes recovery only to a consumer who has sustained "actual damages" or "damages for mental anguish" and who relied to his detriment on the deceptive act, Cruz has not shown that he is a prevailing consumer entitled to section 17.50(b)'s remedies.

**B.     Even if Cruz had prevailed, he is not entitled to an order restoring all amounts paid under the contracts without deducting the value received under those agreements.**

The DTPA authorizes trial courts to restore to any party to the suit the money or property illegally acquired. TEX. BUS. & COM. CODE § 17.50(b)(3). Several courts of appeals (including the

---

[6] PJC 102.1     Question and Instruction on False, Misleading, or Deceptive Act or Practice (DTPA § 17.46(b))

QUESTION ____

    Did *Don Davis* engage in any false, misleading, or deceptive act or practice that *Paul Payne* relied on to his detriment and that was a producing cause of damages to *Paul Payne*?

STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES: BUSINESS, CONSUMER, INSURANCE, & EMPLOYMENT PJC 102.1 (2010).

11

court of appeals in this case) have held that this remedy incorporates the common law of rescission.[7]

If that is so, the consumer must surrender any benefits received. *See Tex. Emp'rs Ins. Ass'n v. Kennedy*, 143 S.W.2d 583, 585 (Tex. 1940); *Smith v. Kinslow*, 598 S.W.2d 910, 915 (Tex. Civ. App.—Dallas 1980, no writ). At common law, rescission also generally requires notice and tender; that is, a plaintiff seeking to rescind a contract must give timely notice to the defendant that the contract is being rescinded and either return or offer to return the property he has received and the value of any benefit he may have derived from its possession. *See, e.g.*, *Kennedy*, 143 S.W.2d at 585; *David McDavid Pontiac, Inc. v. Nix*, 681 S.W.2d 831, 836 (Tex. App.—Dallas 1984, writ ref'd n.r.e.).

Cruz disagrees, noting that the statute uses the term "restore," which is broader than "rescind." He argues that he need not disgorge any benefit received, and that the trial court's finding entitles him to $1,059,940.52 as a matter of law.

Cruz correctly notes that the DTPA did not codify the common law, and that one of its primary purposes is "to provide consumers a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit." *Smith v. Baldwin*, 611 S.W.2d 611, 616 (Tex. 1980). He also points to one case

---

[7] *See* 323 S.W.3d 564, 580-81; *Schenck v. Ebby Halliday Real Estate, Inc.*, 803 S.W.2d 361, 366 (Tex. App.—Fort Worth 1990, no writ); *Green Tree Acceptance, Inc. v. Pierce*, 768 S.W.2d 416, 424 (Tex. App.—Tyler 1989, no writ) ("Where rescission is allowed under the DTPA for breach of warranty, appropriate allowances must be made to prevent unjust enrichment.") (citing D. BRAGG, P. MAXWELL, AND J. LONGLEY, TEXAS CONSUMER LITIGATION § 8.11 (2d ed. 1983)); *Smith v. Kinslow*, 598 S.W.2d 910, 915 (Tex. Civ. App.—Dallas 1980, no writ); *see also Thomas v. State*, 226 S.W.3d 697, 710 (Tex. App.—Corpus Christi 2007, pet. dism'd) (observing that DTPA "authorizes the equitable remedy of rescission and restitution, pursuant to which a consumer may recover all consideration paid for the defective product").

12

suggesting that the Legislature may not have intended to import common law rescission into the DTPA:

> The legislature obviously was well acquainted with the common law concept of rescission, and yet it avoided using that term in favor of the word "restore," which is not a term of art in either the common law or the [UCC]. Therefore, it is reasonable to conclude the legislature intended to create a separate remedy for consumers unburdened by the common law requirement that the rescinding party return the value obtained in the transaction. While providing restoration of the consumer's property without requiring the consumer to return any benefit obtained would provide a windfall to the consumer, such an outcome is consistent with the punitive provisions of the DTPA designed to punish and deter deceptive trade practices.

*Park Forest Baptist Church v. Park Forest Ctr.*, No. 05-96-00188-CV, 1998 WL 107951, at *4 (Tex. App.—Dallas Feb. 27, 1998, pet. denied) (not designated for publication). But that court acknowledged that "while there can be little dispute the DTPA as a whole is not simply a codification of the common law, it does not necessarily follow that the specific remedy provided for in section 17.50(b)(3) is anything more than mere statutory recognition of a common law remedy." *Id*. Ultimately, the court followed its own precedent and applied the common law of rescission. *Id*. at *3.

Our analysis begins with the statute's text, which authorizes a trial court to sign "orders necessary to restore to any party to the suit any money or property, real or personal, which may have been acquired in violation of this subchapter." TEX. BUS. & COM. CODE § 17.50(b)(3). "Restore" means "to give back (as in something lost or taken away)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1936 (1961). It shares the same root as "restitution," which means the act of restoring or a condition of being restored. *Id*. Rescission is merely the "common, shorthand name" for the composite remedy of rescission and restitution. RESTATEMENT (THIRD) OF RESTITUTION AND

UNJUST ENRICHMENT § 54 cmt. a (2011). Rescission is a form of restitution that applies if the transaction may still be unwound; if it cannot, a plaintiff may sue for damages. *See id.* § 37 cmt. a. Thus, "[r]escission is one of the principal asset-based remedies in restitution," and it "restore[s] the parties to the status quo ante by unwinding the contractual exchange instead of pressing it forward." *Id*.

Cruz seeks to rescind the agreements[8]—he asks for all the money paid by him or on his behalf under the agreements—without surrendering the benefits he received. But rescission is not a one-way street. It requires a mutual restoration and accounting, in which each party restores property received from the other. *Id.* § 37 cmt. d ("Rescission is mutual: a plaintiff seeking to be restored to the status quo ante must likewise restore to the defendant whatever the plaintiff has received in the transaction."); *see also Kennedy*, 143 S.W.2d at 585. Thus, it is generally limited to cases in which counter-restitution by the claimant will restore the defendant to the status quo ante. RESTATEMENT § 54(3).

Generally, rescission is an equitable remedy,[9] and Cruz correctly asserts that fault is relevant. A defendant's wrongdoing may factor into whether he should bear an uncompensated loss in those cases in which it is impossible for a claimant to restore the defendant to the status quo ante. *Id.* § 54(3)(b). But it does not excuse the claimant in such cases from counter-restitution when feasible—as it would be here. *Id.* § 54 cmt. c ("A claimant (such as a fraud victim) who has been

---

[8] His post-trial motion seeking this remedy was titled "Motion for Court to Award Remedy of Restoration and Rescission."

[9] *Tex. Emp'rs Ins. Ass'n v. Kennedy*, 143 S.W.2d 583, 585 (Tex. 1940).

14

an innocent party to a legally defective exchange will ordinarily be able to rescind on making restitution (in specie or in value) of any benefits conferred by the other party.").

Cruz concedes that adopting his approach would give him a windfall, but he argues that this is consistent with the DTPA's punitive nature. "DTPA claims generally are . . . punitive rather than remedial." *PPG Indus. v. JMB/Houston Ctrs. Ltd. P'ship*, 146 S.W.3d 79, 89 (Tex. 2004). But that "punishment" is accomplished through the statute's liability and damage provisions—prohibiting deceptive practices and allowing recovery of actual damages, mental anguish damages, treble damages for knowing violations, and attorney's fees. *See, e.g.*, TEX. BUS. & COM. CODE §§ 17.49, 17.50. Restoration is different. It merely provides a prevailing consumer the option of unwinding the transaction, returning the parties to the status quo ante. Putting the parties back where they started means restoring both parties to their original positions.

Moreover, if it is true, as Cruz argues, that the DTPA authorizes restoration only to the consumer, without requiring that he disgorge any benefit received, the statute would have authorized the remedy only for consumers, not for "any party to the suit." *Id.* § 17.50(b)(3). And although the only money or property that can be restored is property that "may have been acquired in violation" of the statute, any value received by the consumer in the illegal transaction "may have been acquired" under the DTPA violation that forms the basis of the claim. *Id.* We agree with the court of appeals that section 17.50(b)(3)'s restoration remedy contemplates mutual restitution.

That conclusion does not compel wholesale adoption of all of the common law rescission requirements, however. Two of those requirements are notice and tender, which courts of appeals have used to reject DTPA restoration claims. *See, e.g.*, 323 S.W.3d at 581 (holding that "under

*Smith* and *David McDavid*, Cruz was obliged to prove and obtain a finding that he had surrendered or offered to surrender to Protech and Martinez the value of the services they provided at his house as a prerequisite for recovering under section 17.50(b)(3)"). But as we have noted, the DTPA was intended "to provide consumers a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit." *Baldwin*, 611 S.W.2d at 616. At least one court of appeals has suggested that DTPA restoration is an independent ground of recovery, requiring only that the consumer choose the remedy subject to the defendant's right to plead and prove an offset, but not incorporating common law predicates like notice and tender. *See Carrow v. Bayliner Marine Corp.*, 781 S.W.2d 691, 696 (Tex. App.—Austin 1989, no writ). We agree that compliance with such requirements is unnecessary under the DTPA. Instead, we adopt the Restatement approach and conclude that notice and restitution or a tender of restitution are not prerequisites to a remedy under section 17.50(b)(3), as long as the affirmative relief to the consumer can be reduced by (or made subject to) the consumer's reciprocal obligation of restitution. *See* RESTATEMENT § 54(5).

But that did not happen here. The trial court's order recited the amounts Cruz or his agents paid Protech, but there was no deduction for the value Cruz received under the contracts. And it was undisputed that Cruz benefitted from the agreements. In addition to dehumidification, Protech arranged for mold testing, helped relocate the Cruz family and their belongings, extracted water from the home, "bio-cleaned" the furniture, and stored the home's contents. Not only that, but Cruz did not pay the entire amount himself—Chubb paid some portion of it. The DTPA does not authorize

an order restoring to Cruz amounts paid by him *and* his insurer under the contract, unaccompanied by a deduction for the value of services Protech provided.

The trial court correctly decided not to award Cruz any remedy on his DTPA claim. Its pretrial finding of the sum necessary to restore to Cruz the amounts paid under the agreement did not entitle Cruz to that amount as a matter of law, and Cruz was not a prevailing party entitled to a DTPA remedy. Cruz has failed to prove conclusively that he was entitled to the $1,059,940,52.

## III. The evidence supported the jury finding that the "main purpose" doctrine applied.

Chubb and Protech had no written contract for services. Instead, Protech relied on an exception to the statute of frauds: the "main purpose" or "leading object" doctrine, a principle we first recognized in 1857 and which applies to unwritten promises made by sureties. *See Lemmon v. Box*, 20 Tex. 329, 333 (1857); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 116 (1981). Protech argued, and the jury found, that Chubb's promise to pay for the dehumidification fell within this exception.

Generally, a promise to pay another's debt must be in writing because "the promisor has received no direct benefit from the transaction." *Cooper Petroleum Co. v. LaGloria Oil & Gas. Co.*, 436 S.W.2d 889, 895 (Tex. 1969). But

> wherever the main purpose and object of the promisor is, not to answer to another, but to subserve some purpose of his own, his promise is not within the statute [of frauds], although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the liability of another.

*Lemmon*, 20 Tex. at 333.

17

In *Gulf Liquid Fertilizer Co. v. Titus*, 354 S.W.2d 378 (Tex. 1962), we considered whether a partner's oral promise to pay a former partner's debt, so that the partnership could obtain credit, was enforceable. We held that the promise was binding because "the consideration necessarily benefited [the partner] as a member of the partnership because he shared in the partnership's ultimate profits, if any, and the benefit he received as a member of the partnership is considered sufficient to satisfy the 'main purpose' rule." *Titus*, 354 S.W.2d at 387. Similarly, in *Haas Drilling Co. v. First Nat'l Bank*, 456 S.W.2d 886, 891 (Tex. 1970), we held that where a bank foreclosed on a debtor's oil lease, the bank's promise to pay the lease was enforceable because "[w]hen the promisor assumes primary responsibility and his leading object is to serve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, the oral promise is not within the Statute of Frauds."

The main purpose doctrine requires that: (1) the promisor intended to create primary responsibility in itself to pay the debt; (2) there was consideration for the promise; and (3) the consideration given for the promise was primarily for the promisor's own use and benefit—that is, the benefit it received was the promisor's main purpose for making the promise. *See Haas*, 456 S.W.2d at 890.

The jury found the requisite elements of the main purpose doctrine had been satisfied, and the trial court rendered judgment on the verdict. The court of appeals reversed, holding that there was no evidence supporting the jury's answer to subpart b, which asked whether Chubb received direct consideration for its promise to be primarily liable for Cruz's debt. 323 S.W.3d at 573-74. The court concluded that Cruz was the primary beneficiary of Chubb's promise to pay, and any

18

benefit to Chubb was "purely speculative." *Id.* But the question is not who was the primary *beneficiary*, but whether Chubb's primary *purpose* in promising to pay was to benefit itself.

Even so, we disagree that Cruz, rather than Chubb, was the primary beneficiary of the dehumidification. The court of appeals held that Cruz benefitted, because "it was his property that was being improved and because the service tended to satisfy his contractual obligation" to mitigate damages. 323 S.W.3d at 573. But Cruz and his family moved out of the house in May 2001, and Chubb did not tender policy limits until December 2003. During that two-and-a-half year period, Cruz repeatedly demanded a resolution, and Chubb continued to seek extra time. The dehumidification payments were deducted from the total payout to Cruz, so it is difficult to understand how he benefitted from those payments rather than from a prompt resolution of the claim, as he repeatedly sought.

We also disagree that Chubb received no consideration for its promise to pay Protech for dehumidifying the house. Protech's services bought Chubb time to adjust the claim and evaluate the damage. Cruz's expert testified that the dehumidification maintained the status quo, giving Chubb more time to decide which course of action to pursue. Cruz's attorney testified that Chubb's decision to engage Protech to dehumidify the home allowed Chubb to "keep a finger in the dike" so that Chubb could conduct additional analysis. Not only did Cruz not benefit from the delay, but because the dehumidification payments were deducted from the amount paid to him, he may have recovered less than he would have had Chubb promptly paid the claim. We conclude that Chubb received direct consideration for its promise to pay for the dehumidification, and the court of appeals erred in concluding otherwise.

19

The court of appeals did not reach Chubb's legal sufficiency challenges to the remaining two findings: that Chubb intended to accept primary liability for Cruz's debt to Protech and that the direct consideration Chubb received was Chubb's main purpose for agreeing to accept primary liability for Cruz's debt. As to the first, evidence supports the jury's answer. The record reflects that, when the parties met in June 2002, Marx promised to pay for Protech to dehumidify the home, and Chubb in fact did pay Protech directly on a number of occasions. Based on this promise and the facts and circumstances of the case, the jury could have found that Chubb agreed to be primarily responsible for Cruz's debt. *See Haas Drilling Co.*, 456 S.W.2d at 889 (noting that the question of intent to be primarily responsible is for the finder of fact, taking into account all the facts and circumstances of the case).

As to the final factor, there was also evidence that Chubb's main purpose in agreeing to accept primary liability for Cruz's debt was to buy time to decide how to proceed with the claim. In January, Chubb told Cruz it could neither accept nor reject his policy limits demand without further investigation. Chubb's contractor, David Gregg, told Chubb that the humidity in the home should be controlled before further damage occurred. Chubb decided to do so, rather than pay the claim, so that it could conduct further testing and try to reach a decision on how to proceed. If Chubb had not wanted extra time, it would not have agreed to control the humidity. We conclude some evidence supports the jury finding that Chubb's main purpose in promising to pay for dehumidification was to gain extra time for its own benefit. Because evidence supports the jury's findings that the three elements of the main purpose doctrine were satisfied, we reverse that portion of the court of appeals' judgment.

20

**IV.    Protech did not make the trial court aware of its charge complaint, timely and plainly, or obtain a ruling.**

Finally, Protech complains that the trial court erred by submitting questions on attorney's fees that did not ask about fees for preparation and trial, although they included questions about appellate attorney's fees. The court of appeals held that Protech waived the issue because it never objected or called the trial court's attention to the omission, and the record did not establish that the trial court refused a request to submit them. 323 S.W.3d at 584-85. Protech admits that the trial court never explicitly refused to include subparts dealing with fees for preparation and trial, but Protech contends that its proposed charge, combined with its objection to one of the attorney's fee questions, preserved error.

Parties and courts have long struggled with requirements for preserving charge error. Our procedural rules state that a complaint to a jury charge is waived unless specifically included in an objection. TEX. R. CIV. P. 274; TEX. R. APP. P. 33.1(a)(1). In *State Department of Highways & Public Transportation v. Payne*, recognizing that charge practice had become a "labyrinth daunting to the most experienced trial lawyers," we simplified the test for determining whether error was preserved. *Payne*, 838 S.W.2d 235, 240 (Tex. 1992). Like most error preservation requirements,[10] the inquiry focuses on the trial court's awareness of, and opportunity to remedy, the problem: "There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *Id*. at 241. We articulated this requirement to simplify a process that had been beset with

---

[10] *See, e.g.*, TEX. R. APP. P. 33.1(a).

21

"complex, intricate, sometimes contradictory, unpredictable rules" that "hardly subserve[d] the fair and just presentation of the case." *Id.*

*Payne*'s cure must not worsen the disease. Trial courts lack the time and the means to scour every word, phrase, and omission in a charge that is created in the heat of trial in a compressed period of time. A proposed charge, whether drafted by a party or by the court, may misalign the parties; misstate the burden of proof; leave out essential elements; or omit a defense, cause of action, or (as here) a line for attorney's fees. Our procedural rules require the lawyers to tell the court about such errors before the charge is formally submitted to a jury. TEX. R. CIV. P. 272. Failing to do so squanders judicial resources, decreases the accuracy of trial court judgments and wastes time the judge, jurors, lawyers, and parties have devoted to the case. *In the Interest of B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003) (discussing the "[i]mportant prudential considerations [that] underscore our rules on preservation").

Here, Protech filed a proposed charge four days before the July 31 trial began. That charge included questions about Protech's reasonable and necessary attorney's fees, and each question included three subparts and answer blanks: one for preparation and trial, one for an appeal to the court of appeals, and one for an appeal to this court. Trial continued for two weeks, and the trial court gave the parties its proposed charge on August 8. That charge omitted the subpart dealing with fees for preparation and trial, although it included the other two subparts for appellate fees. Two days later, after an informal charge conference, the trial court conducted a formal charge conference. At that conference, Protech had only one objection: that Question No. 5, which inquired about the reasonableness and necessity of Protech's attorney's fees against Chubb, should include a ninth

22

factor for jurors to consider when determining the reasonableness of such an award. Specifically, Protech argued that the jury should be asked to consider "whether the services rendered related to the prosecution of plaintiff's claims, which are recoverable, or the defense of defendant's counterclaims, which are not recoverable." The trial court overruled the objection. Protech made no other charge objections or requests.

Protech nonetheless argues that the trial court's failure to include the relevant subparts in Questions 5, relating to attorney's fees against Chubb, and 14, which inquired about attorney's fees against Cruz, was a "clear refusal" to submit Protech's questions. The trial court did not endorse the requests "refused," nor did it ever indicate that it was refusing to submit the questions. While a written refusal is not always necessary to preserve error, the aggrieved party must show that the trial court was aware of the party's request and denied it. *See Dall. Mkt. Ctr. Dev. Co. v. Liedeker*, 958 S.W.2d 382, 386 (Tex. 1997) (per curiam), *overruled on other grounds by Torrington Co. v. Stutzman*, 46 S.W.3d 829, 840 n.9 (Tex. 2000). In *Liedeker*, we held that error was preserved when the record showed that "the trial court admitted that he had considered the requested question, had refused it, and had meant to endorse it but simply failed to do so, for which he was sorry." *Id.* at 387. In *Payne*, although the objection to the charge was not particularly precise, we held that a party's request preserved error because of the trial court's "clear refusal" to submit the theory to the jury. *Payne*, 838 S.W.2d at 239 (noting that "[t]he trial court's failure to submit [the requested question] could hardly have been an oversight"). Similarly, in *Alaniz v. Jones & Neuse, Inc.*, 907 S.W.2d 450, 452 (Tex. 1995) (per curiam), we held that a plaintiff preserved error regarding the trial court's failure to include a subpart for lost profits within the trial court's broad form damage question, where

23

the plaintiff had both filed a proposed charge before trial and objected during the charge conference to the failure to include the requested element.

Here, the parties had ample time to review the draft charge and point out discrepancies to the trial court. The charge that was ultimately submitted to the jury was forty pages long and contained thirty-two questions, most of which had multiple subparts. Protech can complain on appeal only if it made the trial court aware, timely and plainly, of the purported problem and obtained a ruling. *Payne*, 838 S.W.2d at 241. Filing a pretrial charge that includes a question containing that subpart, when no other part of the record reflects a discussion of the issue or objection to the question ultimately submitted, does not sufficiently alert the trial court to the issue.

A charge filed before trial begins rarely accounts fully for the inevitable developments during trial. For these reasons, our procedural rules require that requests be prepared and presented to the court "within a reasonable time *after* the charge is given to the parties or their attorneys for examination." TEX. R. CIV. P. 273 (emphasis added). Notwithstanding our rules, we have held that a party may rely on a pretrial charge as long as the record shows that the trial court knew of the written request and refused to submit it. *Alaniz*, 907 S.W.2d at 451-52. Thus, error was preserved where a party filed a pretrial charge, and the trial court used the very page from that charge that contained the requested question but redacted one of the subparts and answer blanks, and the party objected to the omission. *Id.* Again, trial court awareness is the key.

Although trial courts must prepare and deliver the charge, we cannot expect them to comb through the parties' pretrial filings to ensure that the resulting document comports precisely with their requests—that is the parties' responsibility. It is impossible to determine, on this record,

24

whether the trial court refused to submit the question, or whether the omission was merely an oversight. *Cf. Payne*, 838 S.W.2d at 239. As the court of appeals concluded, "[t]he trial court's overruling of [Protech's] objection does not show that it was refusing to submit a jury question or blank regarding attorney's fees incurred for preparation and trial," 323 S.W.3d at 585, and the record does not otherwise reflect a refusal to submit the question. We conclude the issue was not preserved for appellate review.

## V.     Conclusion

We affirm the court of appeals' judgment with respect to Cruz's DTPA claim and Protech's charge error complaint. We reverse the court of appeals' judgment as to Chubb and remand for that court to consider Chubb's remaining arguments, which include challenges to the factual sufficiency of the evidence supporting the jury findings. TEX. R. APP. P. 60.2(a), (d).

_____
Wallace B. Jefferson
Chief Justice

**OPINION DELIVERED**: April 20, 2012