

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-23-00033-CV

---

ESTATE OF BILLY RAY MARTIN, SR., DECEASED

---

On Appeal from the County Court at Law No. 2
Gregg County, Texas
Trial Court No. 2020-0122-E

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

In this case, Jo Ballard Martin[1] and her grandson, Travis Andrew Martin,[2] each applied to probate wills executed by Billy Ray Martin, Sr. (Martin). After a Gregg County jury determined that Martin lacked testamentary capacity to execute either of the wills, the trial court entered a final judgment that both wills were invalid and of no effect. On appeal, Jo challenges the legal and factual sufficiency of the evidence supporting the jury's findings that (1) Martin did not have testamentary capacity to execute the 2016 Will and (2) that Jo did not act in good faith and with just cause in prosecuting the suit to have the 2016 Will admitted to probate.[3] She also asserts that the trial court erred in overruling her motion for judgment notwithstanding the verdict and in submitting jury question 6, which asked whether Martin had testamentary capacity to execute the 2016 Will. For the reasons stated below, we affirm the trial court's judgment.

I.      Background

As relevant to this appeal, the evidence showed that Martin and Jo were married in 1964 and that their marriage lasted for about twenty years. They had one child, Billy Ray Martin, Jr. (Junior), and Martin adopted Jo's two sons, David and Kevin.[4] During their marriage, Jo worked

---

[1]Jo sought to probate a will dated April 11, 2016 (the 2016 Will).

[2]Travis sought to probate a will dated October 16, 2018 (the 2018 Will).

[3]Although Jo frames her issue as challenging the sufficiency of evidence to find that "Jo . . . did not act in good faith and with just cause to affirm the [2016 Will] and to oppose the [2018 Will]," the jury was only asked if Jo acted in good faith and with just cause in prosecuting the suit to have the 2016 Will admitted to probate. The trial court did not ask the jury to return a finding on whether Jo acted in good faith and with just cause to oppose the 2018 Will.

[4]At the time of trial, only Kevin was still living.

as Martin's legal assistant. After Jo and Martin divorced, he married Minerva, with whom he had no children.

On June 25, 2015, Minerva was appointed guardian of the person of Martin. Shortly thereafter in September 2015, Martin filed for divorce from Minerva. Because Minerva retained the house, Martin began living with Kevin, who was unable to properly care for him because Kevin had an out-of-town job. Jo lived nearby and would check on Martin to ensure that he was eating, taking his medication, and had clean clothes.

According to Jo, Martin asked her to take him to her house and take care of him. She agreed, and Martin moved into Jo's house three or four years before he died.[5] Jo testified that, while Martin lived with her, he took several medications, which she gave to him. She testified, "[H]e would get upset if I didn't give him what he wanted, like, he didn't want to take the medicine all the time, so he would maybe throw it on the wall or throw it at me or whatever[;] [h]e just had a temper, and he used that temper to get at me a lot of the time." She also testified that Martin's memory was good sometimes, but that "99 percent of the time it was bad." Jo explained that Martin did not remember who she, or somebody else, was and that he did not recognize himself in the mirror and asked her, "[W]ho is that man?" She also testified that those things "got steadily worse" and that "[h]e was going downhill . . . all the time[,] [h]is illness was getting worse all the time."[6]

---

[5]Martin died on November 27, 2018. Based on Jo's testimony, the jury could reasonably infer that Martin moved into Jo's house, at the latest, in the fall of 2015.

[6]Nevertheless, at a later point in her testimony, Jo testified (1) that, until he died, Martin could take care of his business, (2) that he sometimes knew who he was, (3) that he knew who she was, and who his children were, and (4) that he knew he had oil and gas wells, investments, and money.

A few months after Martin began living with her, Jo took him to a friend of hers to have the 2016 Will drafted and executed. That will purported to change the beneficiary of his estate from Junior[7] to Jo. The day after Martin's divorce from Minerva was finalized in 2017, he remarried Jo. The guardianship of the person of Martin was closed on March 28, 2018.

Gardner, who filed the application to probate the 2016 Will on behalf of Jo,[8] testified that he thought Martin "had great competency until . . . towards the very end in 2018." He also agreed that Martin "was testamentary capable of writing [the 2016 Will]." Gardner also testified that he had helped Martin renegotiate a lease on one of his properties in 2017. In addition, he testified that he drafted a power of attorney for Martin in 2017 and agreed that he believed Martin had "full capacity" at that time.

Dr. Richard Hamer, a neurologist, testified that Martin was his patient from 2010 until 2018. When he first saw Martin on June 11, 2010, Martin complained of problems remembering the names of people he had known for a long time, of having false beliefs or delusions, such as thinking people were in his house that were not, and of problems with both long- and short-term memory. The medical records from his consultation that day also stated that Martin was not able to tell Hamer much about his wife, including her age or name, and that he did "not realize much about the mechanics of the relationship." However, when given a mini-mental status examination (MMSE) that day, Martin scored 25/30.

---

[7]William Gardner, who had been Martin's attorney since 2003, testified that he drafted a will for Martin in 2004 that left his estate to Junior.

[8]Gardner apparently withdrew from representing Jo. Although the incomplete record does not show why Gardner withdrew, he testified that he drafted the 2018 Will and that he, thereafter, refused to submit it to probate on behalf of Junior.

Hamer also gave Martin MMSEs on January 15, 2015, and July 14, 2016, on which he scored 26/30. He explained that he normally gave his patients a Montreal Cognitive Assessment Examination, which was a more elaborate and better mental examination, but that Martin would not cooperate. Instead, he gave Martin the MMSE, which was a quick and easy test.

An MRI in June 2010 showed that Martin had multiple small strokes in the basal ganglia of his brain, which led to a diagnosis of vascular dementia. Hamer explained that this was called stair-step dementia because the person would be stable for a while, and then there would be a big decline over a few days or few weeks. He also explained that, with all dementia cases, the person would have good days, when he appeared not to have dementia, and bad days, when he would not recognize his family members. He acknowledged that, even at the very end stages of dementia, it was possible for the person to have days or moments of clarity.

Near the end of Hamer's testimony, the following exchanges occurred:

> *Q.* [(by Jo's attorney)] So being that your opinion is probably more likely persistent there based on the history of the disease, would Billy Ray Martin, on October 16th, [2018,] have sufficient ability to understand that he was making a will?
>
> *A.* No, sir, I don't think he would be.
>
> *Q.* Would he have sufficient ability to understand his act of making a will?
>
> *A.* No, sir.
>
> *Q.* Would he have the capacity to know the objects of his bounty?
>
> *A.* Say that one more time, I'm sorry.
>
> *Q.* Would he have the capacity to know the objects of his bounty; in other words, who he was giving his property to?

5

*A.* Oh, yes, sir -- no, sir, he wouldn't be able to.

*Q.* Would he know that he would have the capacity to understand the general nature of his property?

*A.* No, sir.

*Q.* And would he have memory sufficient to collect in his mind the elements of the business of the transaction and hold them long enough to perceive an obvious relation to each other to be able to form a reasonable judgment as to them?

*A.* No, sir, he wouldn't.

. . . .

*Q.* [(by Travis's attorney)] Okay. So do you think, then, I mean, you said you would see him between one and two times a year, so do you -- do you have an exam or record of any time you saw him in 2016?

*A.* Yes, let me go back. . . . So I saw him July 4th, 2016.

*Q.* Okay. And do you know at that time, July 4, 2016, did you have the same opinion or a different opinion about his capacity at that time?

*A.* Pretty much the same opinion that he had memory loss due to dementia; that was my impression.

*Q.* Okay. And do you think at that time that he would have capacity to make a will leaving, you know, understanding his -- the nature of his properties and his family and those kind of things?

*A.* No, ma'am.

*Q.* Okay. So if he made a will on April 11th of 2016, do you think he would have understood what he was doing at that time?

*A.* No, ma'am.

As relevant to this opinion, the jury (1) answered "No" to jury question 6, which asked if Martin had testamentary capacity on April 11, 2016, when he signed the 2016 Will, and (2) answered "No" to jury question 8, which asked if Jo acted in good faith and with just cause in prosecuting the suit to have the 2016 Will admitted to probate.

## II. Jo's Complaint Regarding the Submission of Jury Question 6 Was Not Preserved

In her seventh issue, Jo complains that the trial court erred in submitting jury question 6 because there was no pleading that alleged Martin lacked testamentary capacity to execute the 2016 Will. Our rules provide, "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX. R. CIV. P. 274; *see* TEX. R. APP. P. 33.1(a)(1). Under these rules, "[t]here should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *Daily v. McMillan*, 531 S.W.3d 822, 825 (Tex. App.—Texarkana 2017, no pet.) (quoting *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 829 (Tex. 2012)). As a result, "to preserve error, lawyers must 'tell the court about such errors before the charge is formally submitted to a jury.'" *Id.* (quoting *Cruz*, 364 S.W.3d at 830).

At the charge conference, Jo made no objections to jury question 6. By failing to raise any objection to jury question 6 before the charge was submitted to the jury, she failed to preserve this issue for our review. *See id.* We overrule this issue.

7

### III.     Jo's Challenges to the Sufficiency of the Evidence

#### A.     Standard of Review

In determining legal sufficiency, we determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Basley v. Adoni Holdings, LLC*, 373 S.W.3d 577, 582 (Tex. App.—Texarkana 2012, no pet.). In our review, we "view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller*, 168 S.W.3d at 807. We also indulge every reasonable inference that supports the judgment.[9] *Id.* at 822.

"When an appellant attacks the legal sufficiency of an adverse fact finding on an issue for which he had the burden of proof, he must demonstrate that the evidence established the contested issue as a matter of law." *In re Neville*, 67 S.W.3d. 522, 524 (Tex. App.—Texarkana 2022, no pet.) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). "In its analysis, the reviewing court must examine the record for evidence that tends to support the finding, while disregarding all evidence and inferences to the contrary." *Id.* (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)). "If there is no evidence to support the trial court's finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law." *Id.* (citing *Sterner*, 767 S.W.2d at 690). "The point of error should be sustained only if the contrary proposition is conclusively established." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam) (citing *Croucher*, 660 S.W.2d at 58).

---

[9]The scope of a legal sufficiency review is "the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review." *City of Keller*, 168 S.W.3d at 823.

"When the party having the burden of proof challenges the factual sufficiency of a finding in the trial court, that party must show that the jury's finding was against the great weight and preponderance of the evidence." *In re Est. of Trawick*, 170 S.W.3d 871, 876 (Tex. App.—Texarkana 2005, no pet.) (citing *Croucher*, 660 S.W.2d at 58). "The court of appeals must consider and weigh all the evidence, and may set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* (citing *Francis*, 46 S.W.3d at 242).

**B. Sufficient Evidence Supported the Jury's Finding Regarding Testamentary Capacity**

In her first, second, third, fourth, and fifth issues, Jo challenges the legal and factual sufficiency of the evidence supporting the jury's finding that Martin did not have testamentary capacity when he signed the 2016 Will. Jo argues (1) that Travis was bound by the 2016 Will as a matter of law, (2) that the evidence proved, as a matter of law and by the great weight and preponderance, that Martin had testamentary capacity, and (3) that the only evidence that Martin lacked testamentary capacity when he signed the 2016 Will was a single statement by Hamer, which she contends was conclusory and speculative.

**1. Testamentary Capacity**

We have previously stated,

Testamentary capacity means sufficient mental ability to understand the business in which the testatrix is engaged, the effect of her act in making the will, and the general nature and extent of her property. The testatrix must be able to know her next of kin and the natural objects of her bounty, and she must have a sufficient memory to collect in her mind the elements of the business to be transacted and to hold them long enough to at least perceive their obvious relation to each other and be able to form a reasonable judgment about them.

9

*In re Neville*, 67 S.W.3d at 524 (citing *Bracewell v. Bracewell*, 20 S.W.3d 14, 19 (Tex. App.—Houston [14th Dist.] 2000, no pet.)).  Because the 2016 Will was not admitted to probate, Jo, as the proponent of the will, had the burden to establish Martin's testamentary capacity on the date he signed the will.  *See Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983); *In re Neville*, 67 S.W.3d at 524.

In this case, there was no direct testimony regarding Martin's mental condition on the date he signed the 2016 Will.  However,

> [i]t has always been the rule in Texas that, although the proper inquiry is whether the testator had testamentary capacity at the time he executed the will, the court may *also* look to the testator's state of mind at other times if those times tend to show his state of mind on the day the will was executed.  Evidence pertaining to those other times, however, must show that the testator's condition persisted and probably was the same as that which existed at the time the will was signed.  Whether the evidence of testamentary capacity is at the very time the will was executed or at other times goes to the weight of the testimony to be assessed by the fact[-]finder.

*In re Neville*, 67 S.W.3d at 525 (citing *Croucher*, 660 S.W.2d at 57).

### 2.     Analysis

As previously noted, there was no direct evidence of Martin's mental condition on the day he signed the 2016 Will.  However, viewed in the light favorable to the jury's finding, the evidence showed that Martin began seeing Hamer, his neurologist, in June 2010.  At the time, he complained of problems remembering the names of people he had known for a long time and of having false beliefs or delusions.  He was also unable to tell Hamer the name or age of his wife or to communicate the mechanics of his relationship with her.  Later that month, Martin was diagnosed with vascular dementia.  Hamer explained that persons with that type of dementia will

10

appear stable for a while and then experience periods of sudden decline. He also testified that, as with all dementias, the person will have good days, when he appears normal, and bad days, when he does not recognize his family members.

Hamer also testified that, based on his examinations and treatment of Martin, he did not think that, on October 16, 2018, Martin had sufficient capacity (1) to understand that he was making a will, (2) to know the objects of his bounty or who he was giving his property to, (3) to understand the nature of his property, or (4) to understand the elements of the transaction and to form a reasonable judgment regarding them. He then testified that he saw Martin on July 4, 2016, and that he had the same opinion of Martin's capacity on that date, i.e., he did not think Martin had the capacity to make a will or to understand the nature of his property or of his family.

The evidence also showed that Martin moved into Jo's house several months before he signed the 2016 Will. Concerning Martin's mental condition, Jo testified that, while he lived with her, Martin was subject to bouts of temper and would get upset when he did not get what he wanted and that he did not always take his medicine. She also testified that Martin's memory was bad "99 percent of the time," so that he did not remember who she was, and that he would not recognize himself in the mirror. She also testified that those things got steadily worse and that "[h]e was going downhill . . . all the time[,] [h]is illness was getting worse all the time."

This constitutes some evidence that would enable the jury to reasonably infer that Martin did not have testamentary capacity when he signed the 2016 Will. As a result, we find that

legally sufficient evidence supports that jury finding.  We overrule Jo's first,[10] second,[11] and fifth[12] issues.  To the extent they challenge the legal sufficiency of the evidence supporting that jury finding, we also overrule Jo's third and fourth issues.

Jo also challenges the factual sufficiency of the evidence supporting the jury's finding that Martin lacked testamentary capacity when he signed the 2016 Will.  So, we examine whether the jury's finding was so against the great weight and preponderance of the evidence that it was clearly wrong.

---

[10]In her first issue, Jo asserts that, because Travis introduced the 2016 Will into evidence without any limiting purpose, he was bound for all purposes by that will as a matter of law.  In support of this proposition, he cites *Lock v. Morris*, 287 S.W.2d 500 (Tex. App.—Texarkana 1956, writ ref'd n.r.e.) (per curiam), and *Cotton Belt Gin & Mill Supply, Inc. v. Alltex Precision Co.*, 351 S.W.2d 369, 370 (Tex. App.—Texarkana 1961, no writ).  However, neither of these cases involved a will contest.  Further, in *Gevinson v. Manhattan Construction Co. of Oklahoma*, the Texas Supreme Court held,

> It has been said that one who introduces a document vouches for its accuracy and will not be allowed to impeach or contradict its recitals.  This rule can avail plaintiffs nothing, because it has been largely engulfed by its own exceptions.  In analogy to the rule that a party may prove the truth of particular facts in direct contradiction of the testimony of his witness, he may also disprove factual recitals in a document introduced by him.

*Gevinson v. Manhattan Const. Co. of Okl.*, 449 S.W.2d 458, 466 (Tex. 1969).  We find nothing in *Lock*, *Alltex Precision Co.*, or *Gevinson* that would bar Travis from challenging Martin's testamentary capacity to execute the 2016 Will.  We overrule this issue.

[11]In her second issue, Jo challenges the trial court's denial of her judgment non obstante veredicto in regard to the jury's finding that Martin did not have testamentary capacity when he signed the 2016 Will.  A party is only entitled to a judgment notwithstanding the verdict if she is entitled to judgment as a matter of law.  *See* TEX. R. CIV. P. 301; *Hogue v. Blue Bell Creameries, L.P.*, 922 S.W.2d 566, 568–69 (Tex. App.—Texarkana 1996, writ denied).  Because there was some evidence that supported the jury's finding, we overrule this issue.

[12]In her fifth issue, Jo asserts that the only evidence that supported the jury's finding was the following testimony from Hamer:

> *Q.*      Okay.  So if he made a will on April 11th of 2016, do you think he would have understood what he was doing at that time?
>
> *A.*      No, ma'am.

Jo argues that this testimony was conclusory and speculative and, therefore, not evidence that can support the jury's finding.  As a result, she argues, no evidence supports the jury's finding.  Because other evidence sufficiently supported the jury's finding, this issue is without merit, and we overrule it.

12

Jo first points to Martin's scores on the MMSE of 25/30 on June 11, 2010, and 26/30 on January 15, 2015, and July 14, 2016. She argues that, because the suggested guideline of "severity of cognitive impairment" on the MMSE states that a score of greater than or equal to 21 is indicative of a mild cognitive impairment, those scores showed that Martin "did not have any cognitive impairment." However, there was no expert testimony in support of Jo's interpretation of those scores. That interpretation also conflicts with Hamer's notes from June 11, 2010, which indicated that Martin was not able to tell him much about his wife, including her age or name, that he did "not realize much about the mechanics of the relationship," and that he was having problems with both his short- and long-term memory.

Jo also relies on Gardner's testimony (1) that he thought Martin "had great competency until . . . towards the very end in 2018," (2) that Martin "was testamentary capable of writing [the 2016 Will]," (3) that he had helped Martin renegotiate a lease on one of his properties in 2017, and (4) that he drafted a power of attorney for Martin in 2017 and believed Martin had "full capacity at that time." In addition, Jo relies on her own testimony (1) that, until he died, Martin could still take care of his business, (2) that he sometimes knew who he was, (3) that he knew who she was and who his children were, and (4) that he knew he had oil and gas wells, investments, and money.

"When evidence conflicts, the jury's role is to evaluate the credibility of the witnesses and reconcile any inconsistencies, and as a general proposition, the jury may 'believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness.'" *Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018) (footnote omitted) (citation

omitted) (quoting *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 774–75 (Tex. 2003)). Further, "[i]t is the function of the jury to pass on the weight of the evidence and the credibility of the witnesses; and, where there is conflicting evidence, the jury verdict on such matters is generally regarded as conclusive." *McClung v. Ayers*, 352 S.W.3d 723, 728 (Tex. App.—Texarkana 2011, no pet.) (citing *City of Keller*, 168 S.W.3d at 827). We "cannot substitute [our] judgment for that of the jury." *Id.* (citing *City of Keller*, 168 S.W.3d at 827).

In this case, Jo relies on evidence that conflicts with the testimony and other evidence that supports the jury's finding. Although there are conflicts in the testimony of the witnesses, it was within the jury's discretion to believe the testimony supporting its verdict and to disbelieve the testimony contrary to it. *City of Keller*, 168 S.W.3d at 819. As a result, we are not able to say that the jury's finding was against the great weight and preponderance of the evidence. We overrule Jo's third and fourth issues to the extent they challenge the factual sufficiency of the evidence supporting the jury's finding that Martin lacked testamentary capacity when he signed the 2016 Will.

### C. Sufficient Evidence Supported the Jury's Finding Regarding Jo's Conduct in Prosecuting the Suit to Have the 2016 Will Admitted to Probate

In her sixth issue, Jo asserts that there was legally and factually insufficient evidence to support the jury's finding that she did not act in good faith and with just cause in prosecuting the suit to have the 2016 Will admitted to probate. Consequently, she argues, she is entitled to recover her reasonable attorney fees. *See* TEX. EST. CODE ANN. § 352.052(b) (providing that a devisee or beneficiary of a will who prosecutes a proceeding to have the will admitted to probate

14

"in good faith and with just cause" may recover her "necessary expenses . . . including reasonable attorney's fees.")

Jo relies on the same evidence as she does in her sufficiency challenge to the jury's finding on Martin's testamentary capacity, which we addressed above. The same evidence supporting the legal and factual sufficiency that we discussed in relation to the jury finding on Martin's testamentary capacity supported the jury finding that Jo did not act in good faith and with just cause in prosecuting the suit to have the 2016 Will admitted to probate. In addition, the evidence showed that Jo took Martin to a friend of hers to draft and execute the 2016 Will, rather than taking him to his long-time attorney, Gardner. The jury could reasonably infer that she did so because she was concerned about Martin's testamentary capacity. This evidence also supported this jury finding. For the reasons stated above, we find that legally and factually sufficient evidence supported the jury's finding that Jo did not act in good faith and with just cause in prosecuting the suit to have the 2016 Will admitted to probate.[13] We overrule this issue.

---

[13]In addition to her evidentiary argument, Jo asserts that, whether she acted in good faith and with just cause is a legal question. However, the Texas Supreme Court has long held that whether a person acts in good faith and with just cause in offering a will for probate is a fact question. *See Huff v. Huff*, 124 S.W.2d 327, 330 (Tex. 1939); *Russell v. Moeling*, 526 S.W.2d 533, 536 (Tex. 1975). Jo also asserts that her good faith and just cause may be presumed, citing *Miller v. Anderson*, 651 S.W.2d 726, 728 (Tex. 1983), and *In re Kam*, 484 S.W.3d 642, 654–55 (Tex. App.—El Paso 2016, pet. denied). However, in both *Miller* and *In re Kam*, unlike this case, the proponent's will was admitted to probate, which established the benefit to the estate justifying the award of attorney fees. *Miller*, 651 S.W.2d at 728; *In re Kam*, 484 S.W.3d at 655.

## IV.    Conclusion

For the reasons stated, we affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:     December 4, 2023
Date Decided:       January 10, 2024