

# IN THE
# TENTH COURT OF APPEALS

### No. 10-12-00111-CV

**DANIEL WAYNE STEELE
AND ROBERT DWAYNE STEELE,**

                                                                    **Appellants**

 **v.**

**TYSON GODDARD
AND MYLEA GODDARD,**

                                                                    **Appellees**

<hr>

From the 13th District Court
Navarro County, Texas
Trial Court No. 09-18516-CV

## MEMORANDUM OPINION

In this appeal, appellants, Daniel Wayne Steele and Robert Dwayne Steele, complain about a jury verdict in a case arising from the sale of real property. In five issues, appellants challenge various parts of the final judgment. We affirm, in part, and reverse and render, in part. We also suggest a remittitur of $77,019.94, plus $7,860.25 in

pre-judgment interest, and modify the judgment to reflect the Goddards' election of recovery under the Texas Deceptive Trade Practices Act ("DTPA").

## I.  FACTUAL BACKGROUND

Daniel owned a house located at 1004 Hidden Hills in Corsicana, Texas.  For over twenty years, Daniel rented this house to different people, including family members Gale and Cathy Ramm from 2004 to 2007.  However, due to Daniel's advancing age and deteriorating health, Robert and his sister suggested that Daniel sell the house.[1]  To help facilitate the sale of the house, Robert gave the realtor his e-mail address and fax numbers when the realtor requested contact information for the seller's side of the transaction.

Thereafter, the realtor provided Daniel with a Seller's Disclosure Notice to be completed prior to listing the house.  *See* TEX. PROP. CODE ANN. § 5.008 (West Supp. 2012) (requiring the seller of a residential property to deliver to the potential buyer a seller's disclosure notice describing the character, improvements, and condition of the property).  Robert noted several times in his testimony that he filled out the disclosure form based on Daniel's answers to the questions.  However, the realtor, Julie Teel, testified that she completed the disclosure form that was submitted as a trial exhibit with Daniel's assistance.  Robert later explained that he had filled out another disclosure form, though he did not know what happened to that version.  There is no

---

[1] At the time of trial, Daniel was eighty years old.  In addition, the record establishes that Robert is Daniel's son.

evidence in the record establishing that the disclosure form allegedly filled out by Robert was provided to appellees, Tyson and Mylea Goddard.

In any event, the disclosure form, a standard form promulgated by the Texas Association of Realtors, asked, among other things, whether Daniel was aware that the house had wood rot, an active infestation of termites or other wood-destroying insects, been previously treated for termites or wood-destroying insects, or had damage caused by termites or wood-destroying insects. To each of these questions, Daniel answered, "no."

Subsequently, the Goddards, who were first-time homebuyers, made an offer to purchase the house for $78,500. As part of their contract with Daniel, the Goddards paid $25.00 for a fourteen-day termination option, which was to be credited to the sales price at closing. During this fourteen-day period, the Goddards enlisted the services of Don Harvey to conduct an inspection of the house and Hudine Sykes to prepare a wood-destroying insect report. Sykes did a visual inspection of the interior and exterior of the house and did not find an infestation of wood-destroying insects. However, Sykes noted that the soil grade was too high—a conducive condition for wood-destroying insects. Harvey, on the other hand, inspected the structural and electrical aspects of the house, as well as the heating, venting, and air-conditioning systems, appliances, and plumbing. Like Sykes, Harvey also noted that the front slab of the house "is at, or below grade," which was an item in need of repair. As a result of the inspections, the Goddards requested that the Steeles trench around the house. Teel informed Robert about the need for trenching, and Robert ensured that the trenching

was completed. No termites or mud tubes were found after the trenching was completed.

When asked about his knowledge of any problems with the house prior to the sale, Tyson noted that:

> [W]hen we actually did the initial walk through and it kind of caught my eye was the drywall. But before that it was kind of a wet day when we went to look at it. It was like real misty, mildewy [sic], you know, out. And when she unlocked the door, she kind of had to hit it with her shoulder because it was sticking. And I thought that was odd, but I figured the door swelled because it was a wooden door. And then once we walked in I looked to the left and I seen [sic] there was a white patch there, you know, how do you mess up a 5 foot by 3 foot white patch in the wall? And that's when I asked her what it was.

Tyson also stated that there was an area under the living room window that had fresh sheetrock and had recently been taped and bedded.[2] In addition, there was a Plexiglas panel in place of one of the panes of the living room window.

With regard to repairs done to the house prior to its sale, Robert stated, in his deposition, that:

> When it became evident that [Daniel's] health was deteriorating and he was unable to manage the property, I suggested we will sell the house. When I walked into the house, it was apparent that repairs were needed. The carpets were destroyed. There were holes in some of the closet doors, and the hollow doors, and I can't recall what the kitchen floor was like, but it looked like it needed repair.

Therefore, Robert hired a worker to "replace the hollowed closet doors that had been damaged, to repair in the master bedroom in the ceiling some drywall that had water damage, to replace the kitchen floor, and to repair or replace part of the carpet."

---

[2] Robert denied being proficient at taping and bedding sheetrock. On the other hand, Daniel admitted that he has experience doing such tasks.

Daniel was also deposed, wherein he stated that wood rot on the exterior siding of the house was covered with tin. And despite noting in the disclosure form that the house had not been treated for termites, Daniel testified that he had the house treated for termites prior to selling it to the Goddards. However, Daniel insisted that he was unaware of any infestations of termites.

The Goddards were provided with a copy of the completed disclosure form and eventually closed on the house. Tyson recalled that when he and Mylea first moved into the house, they noticed the following under a window near the white kick trim:

> That was all brand new when we came in there. It was not painted and it wasn't wood. It was the new composite, plastic composite trim. And the wall didn't have texture on it either. The rest of the house has like a real rough like texture and like hand troweled and this doesn't.

Tyson also noted that the house appeared to have been freshly painted, though it had not been textured. In his testimony, Tyson suggested that the Steeles' repair work was designed to cover up damage soon to be discovered.

Within a week of moving in, the Goddards discovered major problems with the house. After removing a three feet by four feet piece of wood paneling in the kitchen, the Goddards observed numerous mud tubes used by termites in the walls. The Goddards subsequently opened up several other walls in the house and discovered extensive wood rot and termite damage. Numerous photographs admitted into evidence showed the extensive damage that was lurking behind the walls. Both inspectors, Harvey and Sykes, testified that they were not allowed to bore into the walls of the house when they conducted their inspections and that they did not see any

termite damage or wood rot based on their visual inspections. Moreover, after the trenching was completed, no one observed any mud tubes or termites near the house.

According to Mylea, she and Tyson spent $2,500 attempting to remedy the damage. However, the task proved to be too much. The Goddards later moved to Iowa, though they continue to make payments on the house. Mylea testified that, at the date of trial, they had made $24,202.22 in house payments. Regarding the value of the house, Tyson stated that an investor had offered him $15,000 for the land upon which the house sits.

## II.    PROCEDURAL BACKGROUND

On September 17, 2009, the Goddards filed suit in Navarro County against Daniel, Robert, Harvey, and Sykes, alleging numerous violations of the DTPA. Harvey and Sykes were later dropped from the lawsuit.[3] In their live pleading, their third-amended original petition, the Goddards asserted that Daniel and Robert: (1) engaged in fraud by failing to disclose and hiding defects in the house; (2) made false representations of past or existing material fact for the purpose of inducing the Goddards into the real-estate contract; (3) breached the real-estate contract; (4) breached implied warranties of merchantability and habitability associated with the house; and (5) violated the DTPA. Specifically, with regard to the DTPA, the Goddards alleged that Daniel and Robert's conduct was knowing and intentional and that they,

> suffered mental anguish in connection with the defects in the home that
> was sold to them as their residence and in connection with their inability

---

[3] The trial court's final judgment indicates that the Goddards settled with Sykes for $10,000.

to repair it to an extent that would make it habitable and as a result of the need to continue to expend funds on the note to keep from being placed in default and, as a young working couple with small children, having their credit reputation ruined.

Moreover, the Goddards also requested that the transaction in question be rescinded.

This case was eventually tried to a jury. At the conclusion of the evidence, the jury determined that: (1) Daniel entered into an agreement with the Goddards to provide them a house free of wood rot and termite damage in exchange for the purchase price; (2) Daniel failed to comply with the agreement; (3) Daniel and Robert knowingly or intentionally engaged in false, misleading, or deceptive acts regarding the quality of the house that were designed to induce the Goddards into the transaction; (4) Daniel and Robert's conduct was unconscionable and was the producing cause of the Goddards' damages; (5) Daniel and Robert committed fraud against the Goddards; (6) Daniel and Robert were negligent and their negligence proximately caused the Goddards' damages; (7) Daniel and Robert's conduct was not excused by waiver; and (8) Daniel was 40% responsible for the Goddards' damages, and Robert was 60% responsible. With regard to damages, the jury awarded the Goddards $77,019.94 based on the market-value of the house on the date of sale; $24,202.22 for the mortgage payments made by the Goddards; $2,500 for reasonable and necessary expenses incurred in attempting to repair the house; $75,000 in attorney's fees; and $200,000 in additional damages because the conduct was committed knowingly or intentionally. Of the $200,000 in additional damages, Daniel was deemed responsible for $80,000 with Robert responsible for the remainder.

On January 13, 2012, the trial court entered its final judgment, adopting the jury's findings on liability. Regarding damages, the trial court awarded the Goddards: (1) $103,722.16 in actual damages, plus an additional $77,019.94, for a total amount of $180,742.10; (2) $75,000 in attorney's fees; (3) additional damages of $80,000 against Daniel; (4) additional damages of $120,000 against Robert; (5) $18,455.72 in pre-judgment interest at a rate of 5% per annum; and (6) post-judgment interest at a rate of 5% compounded annually. The trial court also allowed the Goddards to rescind the real-estate contract. For damages not directly apportioned to either Daniel or Robert, the trial court ordered that each are jointly and severally liable, though Daniel was deemed responsible for 40% of the damages that were not apportioned. And finally, the trial court reduced the Goddards' damages award by $10,000 to account for the settlement agreement executed with Sykes. In sum, the Goddards were awarded $464,187.82 in damages in this case.

Thereafter, the Goddards filed a motion to remit the portion of the damages award corresponding to the market-value of the house. Ostensibly, the Goddards requested that the trial court eliminate $77,019.94, plus $7,860.25 of pre-judgment interest corresponding to the market-value amount, from the damage award.[4]

The Steeles filed various post-judgment motions, including a motion for new trial and a motion to modify the trial court's judgment. All of the Steeles' post-

_____

[4] In reviewing the trial court's final judgment, it does not appear that the damages associated with the jury's market-value determination were remitted. However, in all fairness, the Goddards moved to remit the jury's damages award on the same day that the trial court signed its final judgment.

judgment motions were overruled by operation of law. *See* TEX. R. CIV. P. 329b(c). This appeal followed.

## III. STANDARD OF REVIEW

An appellate court may sustain a legal-sufficiency challenge only when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem., Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable

minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Absent an objection to the jury charge, the sufficiency of the evidence is reviewed in light of the charge submitted. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000).

## IV. SUFFICIENCY OF THE EVIDENCE SUPPORTING THE JURY'S LIABILITY FINDINGS AGAINST ROBERT

In their first issue, the Steeles argue that the jury's liability findings against Robert are not supported by legally and factually sufficient evidence.[5] Specifically, the Steeles contend that the record does not contain any evidence demonstrating that Robert knew about the termite issues, made any representations to the Goddards, or attempted to conceal anything relating to the termite damage. As noted earlier, the jury determined that Robert was liable to the Goddards for fraud, negligence, and DTPA violations. We now turn to the alleged DTPA violations.

---

[5] It is noteworthy to mention that the Steeles' appellate brief is labeled "Appellants' Brief," yet they only challenge the jury's liability findings as to Robert, not Daniel.

## A. DTPA

It is undisputed that the Goddards are "consumers" within the context of the DTPA and that the DTPA applies in this case. *See* TEX. BUS. & COM. CODE ANN. § 17.45(4) (West 2011) (stating that a "consumer" is "an individual . . . who seeks or acquires by purchase or lease, any goods or services . . ."). A consumer may bring a DTPA cause of action for either a violation of section 17.46(b) of the DTPA (the so-called "laundry list") relied on by the consumer to the consumer's detriment or for an unconscionable action or course of action if the violation or action "constitute[s] a producing cause of economic damages or damages for mental anguish." *Id.* § 17.50(a)(1), (3) (West 2011). The "laundry list" prohibits various types of misrepresentations. *See id.* § 17.46(b) (West 2011). The DTPA also defines an unconscionable action or course of action as "an act or practice which, to the consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id.* § 17.45(5). Under section 17.46(a), false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful and are subject to action by the consumer protection division under sections 17.47, 17.58, 17.60, and 17.61 of the civil practice and remedies code. *Id.* § 17.46(a).

With regard to the DTPA, the jury concluded that both Daniel and Robert engaged in false, misleading, or deceptive acts or practices that the Goddards relied upon to their detriment and that were a producing cause of the Goddards' damages.

The charge provided the following fact-specific definition for "[f]alse, misleading, or deceptive act or practice":

a) representing that the house had characteristics that it did not have;

b) representing that the house was of a particular quality when it was of another;

c) failing to disclose information concerning the house which was known at the time of the transaction if such failure to disclose such information was intended to induce the Goddards into the transaction and into which they would not have entered had the information been disclosed . . . .

The language used in the charge corresponds to the following provisions of section 17.46:

the term 'false, misleading, or deceptive acts or practices' includes, but is not limited to, the following acts:

. . .

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

. . .

(13) knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;

. . .

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed . . . .

*Id.* § 17.46(b)(7), (13), (24).

In their brief, the Steeles assert that Robert's involvement in the transaction was confined to: (1) suggesting that Daniel sell the house; (2) serving as a scrivener for a disclosure notice that the Goddards never received; (3) providing his e-mail address to Teel to facilitate communications with Daniel; (4) paying to have flooring replaced and painting the house upon Teel's suggestion; (5) installing a couple of doors in the house; and (6) cleaning the house for sale. The Steeles emphasize that Robert was not involved with the disclosure notice that was provided to the Goddards, nor did he participate in or know about the repairs about which the Goddards complain. In response, the Goddards posit that Robert wanted to see the house sold, took extensive measures to hide obvious defects in the house, and assisted Daniel in making false disclosures about the existence of the damage.

After reviewing the evidence adduced at trial, we do not find sufficient evidence to support the jury's DTPA liability finding against Robert. This is true for a number of reasons. First, there is no evidence that Robert made any representations directly to the Goddards regarding the condition of the house. *See, e.g., Rinaldini v. Bizzelle*, No. 04-00-00865-CV, 2002 Tex. App. LEXIS 3601, at *7 (Tex. App.—San Antonio May 22, 2002, no pet.) (refusing to hold a pest-control contractor liable under the DTPA because he had never spoken to or met the buyers of the house; thus, "he could not have made a representation or failed to disclose information that the Rinaldinis relied upon in purchasing the house"). Though Robert testified that he helped Daniel fill out one of the disclosure forms, Teel testified that she helped Daniel fill out the disclosure form that was provided to the Goddards. No testimony was adduced regarding the

whereabouts of the disclosure form allegedly filled out by Robert. In any event, the testimony of both Robert and Teel clearly establishes that the responses contained in the disclosure form were Daniel's. *See* TEX. BUS. & COM. CODE ANN. § 17.46(b)(7); *see also Dentler v. Helm-Perry*, No. 04-02-00034-CV, 2002 Tex. App. LEXIS 8167, at **16-17 (Tex. App.—San Antonio Nov. 20, 2002, no pet.) (refusing to hold listing realtors for the property—non-parties to the transaction—liable under the DTPA based upon the representations made by the seller in the Seller's Disclosure Notice).[6] Both Robert and Teel stated that they were ostensibly scriveners.

In addition, with respect to section 17.46(b)(24), the nondisclosure portion of the DTPA, we fail to see how Robert had any duty to disclose any information to the Goddards considering he was not the seller of the house. Furthermore, other than surmise and suspicion, the Goddards did not tender any evidence establishing that Robert had knowledge of the termite damage.

And finally, we also note that several Texas courts have held that the mere nondisclosure of material information is not enough to establish an actionable DTPA claim. *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 744 (Tex. App.—Fort Worth 2005,

---

[6] Specifically, the San Antonio Court of Appeals stated that:

> Both Dentlers state in their affidavits that the only disclosure or representation made to them was the information contained in the Seller's Disclosure Notice; however, that information was the representation by Helm-Perry, not by the Listing Realtors. Accordingly, there is no evidence that the Listing Realtors made an actionable representation to the Dentlers regarding the past flooding condition of the property as required by section 17.46(b)(7), and the trial court properly granted summary judgment in favor of the Listing Realtors as to the DTPA claim.

*Dentler v. Helm-Perry*, No. 04-02-00034-CV, 2002 Tex. App. LEXIS 8167, at **16-17 (Tex. App.—San Antonio Nov. 20, 2002, no pet.).

no pet.) (citing *Robbins v. Capozzi*, 100 S.W.3d 18, 26 (Tex. App.—Tyler 2002, no pet.); *Century 21 Real Estate Corp. v. Hometown Real Estate Co.*, 890 S.W.2d 118, 126 (Tex. App.—Texarkana 1994, writ denied)); *see Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493, 502 (Tex. App.—Eastland 2002, pet. denied) ("Non-disclosure without evidence that a defendant had knowledge of the undisclosed information and intentionally withheld the information is not actionable." (citing *Robinson v. Preston Chrysler-Plymouth, Inc.*, 633 S.W.2d 500, 502 (Tex. 1982))). Additionally, the plaintiff must show that the information allegedly withheld was done so with the intent of inducing the consumer to enter into the transaction. *Willowbrook Foods, Inc. v. Grinnell Corp.*, 147 S.W.3d 492, 507 (Tex. App.—San Antonio 2004, pet. denied) (citing *Robbins*, 100 S.W.3d at 26; *Century 21 Real Estate Corp.*, 890 S.W.2d at 126). Here, the Goddards failed to introduce any evidence demonstrating that Robert had a duty to disclose information as a non-seller and that his alleged failure to disclose information was done with the intention of inducing the Goddards to enter into or complete the transaction.

Based on the foregoing, we cannot say that the Goddards introduced more than a scintilla of evidence establishing a DTPA violation as to Robert. *See Rocor Int'l, Inc.*, 77 S.W.3d at 262; *see also Kindred*, 650 S.W.2d at 63. Accordingly, we conclude that the DTPA-liability finding against Robert is not supported by legally sufficient evidence. *See Islas*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827, *Martinez*, 977 S.W.2d at 334; *Kindred*, 650 S.W.2d at 63.

## B. The Jury's Negligence and Fraud Findings

The jury also determined that Robert was negligent and engaged in fraud in the sale of the house. The Steeles challenged these findings on appeal. Despite our conclusion regarding the DTPA-liability finding against Robert, we must now turn to the jury's negligence and fraud findings against Robert.

### 1. Negligence

To prevail on a negligence cause of action, the plaintiff must establish the existence of a duty, a breach of that duty, and damages proximately caused by the breach. *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987). The threshold inquiry in a negligence case is duty. *Poole*, 732 S.W.2d at 311. The question of duty turns on the foreseeability of harmful consequences, which is the underlying basis for negligence. *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 296 (Tex. 1983); *see Nicholson v. Smith*, 986 S.W.2d 54, 59 (Tex. App.—San Antonio 1999, no pet.). The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996); *see Nicholson*, 986 S.W.2d at 59.

Based on our review of the record, we fail to find any evidence addressing the negligence elements as to Robert. As noted earlier, Robert was not the seller of the house; rather, he was a stranger to the contract between Daniel and the Goddards. As such, Robert owed no duty to the Goddards in this transaction, and the Goddards did not proffer evidence establishing the contrary. *See Love*, 92 S.W.3d at 454; *see also Poole*, 732 S.W.2d at 311. Moreover, without evidence that Robert knew about the termite

damage, a reasonable factfinder could not have concluded that Robert breached any duty owed to the Goddards. *See Love*, 92 S.W.3d at 454. We therefore conclude that the negligence finding against Robert is not supported by legally sufficient evidence. *See Islas*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827, *Martinez*, 977 S.W.2d at 334; *Kindred*, 650 S.W.2d at 63.

### 2. Fraud

The elements of a cause of action for fraud are: (1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party suffered injury as a result. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001).

As we stated earlier, the record does not reflect that the disclosure form allegedly filled out by Robert was ever provided to the Goddards. In addition, the record does not contain evidence establishing that Robert made a material representation that was false and made with the intention that the Goddards would rely upon it to their detriment. Accordingly, we cannot say that the fraud finding against Robert is supported by legally sufficient evidence. *See Islas*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827, *Martinez*, 977 S.W.2d at 334; *Kindred*, 650 S.W.2d at 63.

## C.     Robert's Liability

In summary, under the applicable standard of review, we conclude that the record does not contain legally sufficient evidence establishing that Robert engaged in actionable conduct under the DTPA.  We also conclude that the negligence and fraud findings against Robert are not supported by legally sufficient evidence.  Therefore, based on the foregoing, we sustain the Steeles' first issue on appeal.

## V.     THE DAMAGES AWARD

In their remaining issues, the Steeles assert numerous complaints about the damages awarded to the Goddards.  Specifically, the Steeles allege that:  (1) Tyson's testimony that the house was worth $78,500 or, in other words, the exact amount the Goddards paid for the house conclusively established the absence of damages; (2) the Goddards were improperly awarded rescission of the contract; (3) the final judgment awards the Goddards a double recovery; and (4) the attorney's fee award is improper because the Goddards sustained no damages.

## A.     The Damages Award Pertaining to Robert

At the outset of our analysis of the damages award, we note that we have previously concluded that the record does not contain sufficient evidence to support liability as to Robert.  And because the evidence is insufficient as to Robert's liability under the causes of action alleged by the Goddards, we cannot uphold the portion of the damages award pertaining to Robert.  Accordingly, we reverse the portion of the judgment assessing damages against Robert and render judgment that the Goddards

take nothing as to Robert. However, despite this conclusion, we must still analyze the damages award as it pertains to Daniel.[7]

**B.      The Remaining Damages**

**1.      Tyson's testimony about the market value of the house**

With regard to the remaining damages, the Steeles first argue that Tyson's testimony regarding the market value of the house at the time of purchase conclusively disproves any damages. Tyson testified that the house was worth $78,500—the purchase price under the contract—at the time of sale. However, implicit in Tyson's testimony is that this value does not account for the extensive termite damage in the house that was discovered after the sale. This is true because Tyson was later asked about the market value of the house at the time of trial. Tyson testified that the house was worth $15,000 at the time of trial, which was based on a $15,000 offer made by an investor for the land upon which the house is situated. *See Redman Homes v. Ivy*, 920 S.W.2d 664, 669 (Tex. 1996) (noting that a property owner is qualified to testify to the market value of his property); *see also Lawrence v. Kinser*, No. 05-10-00173-CV, 2011 Tex. App. LEXIS 9832, at *13 (Tex. App.—Dallas Dec. 15, 2011, no pet.) (mem. op.). Based on this testimony, we disagree with the Steeles' assertion that Tyson's testimony about the market value of the house at the time of sale conclusively disproves any damages in this case.

---

[7] Despite failing to challenge Daniel's liability under the alleged causes of action, the Steeles do challenge the damage awards against Daniel.

## 2. Sufficiency of the evidence supporting damages

In several sub-issues, the Steeles also complain that the evidence supporting the award of actual damages is insufficient. Most of their sub-issues are premised on a finding that Tyson's testimony conclusively disproved any damages—a finding we rejected earlier. However, in one sub-issue, the Steeles challenged the award for repair costs. In particular, the Steeles assert that, under the DTPA, the Goddards cannot receive both repair damages and valuation damages. *See Cent. Freight Lines, Inc. v. Naztec, Inc.*, 790 S.W.2d 733, 734 (Tex. App.—El Paso 1990, no writ) ("Where the injury to the property has not resulted in its total loss and the repair of the damaged property is economically feasible, the plaintiff may elect to recover the reasonable cost of repairs.").

We disagree with the Steeles' assertion that the Goddards were barred from recovering repair damages because they also recovered valuation damages. We first note that the *Central Freight Lines* case is not a DTPA case and the El Paso Court of Appeals did not specifically hold that a plaintiff cannot recover repair damages in addition to valuation damages. *See generally id.* Instead, the El Paso Court of Appeals emphasized that "the primary objective in awarding damages in civil cases has been to compensate the injured plaintiff . . . ." *See id.* Here, Mylea testified that she and Tyson spent $2,500 to repair the house until they determined that the house was not salvageable. Also included as exhibits are copies of the receipts supporting the testimony about the repairs made. Furthermore, section 17.50(b)(1) of the Texas Business and Commerce Code provides that a prevailing consumer may recover "the

amount of economic damages found by the trier of fact." TEX. BUS. & COM. CODE ANN. §

17.50(b)(1). Section 17.45(11) of the Texas Business and Commerce Code defines

"[e]conomic damages" as "compensatory damages for pecuniary loss, including costs of

repair and replacement." *Id.* § 17.45(11). Therefore, based on the language of the

DTPA, the Goddards were entitled to recover costs of repair, in addition to costs of

replacement.[8] *See id.*; *see Valley Nissan, Inc. v. Davila*, 133 S.W.3d 702, 712-13 (Tex.

App.—Corpus Christi 2003, no pet.) (concluding that, in a DTPA case, damages sought

for loss of the fair market value of a trade-in vehicle and out-of-pocket expenses "fall

squarely within the DTPA's definition of 'economic damages'").

Based on the foregoing, we overrule the Steeles' second issue as it pertains to

Daniel.

### 3. Rescission

In their third issue, the Steeles contend that the judgment improperly awards

rescission of the real estate contract. This issue is broken into two parts: (1) rescission

as to Robert; and (2) rescission as to Daniel and Robert.

---

[8] The Steeles also argue that the record does not contain testimony indicating that the repair costs were reasonable and necessary. Though neither Tyson nor Mylea were asked whether the repairs were reasonable and necessary, receipts supporting the repair costs were proffered, and both Tyson and Mylea testified about the deplorable condition of the house as a result of the termite damage and the items that needed repairing. Thus, based on the testimony and the evidence submitted, we believe that the jury was free to infer that the repair costs were reasonable and necessary. *See Bernstein v. Thomas*, 298 S.W.3d 817, 826 (Tex. App.—Dallas 2009, no pet.) ("An objective valuation of services, such as a bill, receipt or, as in this case, an estimate, is evidence from which a jury can infer reasonable cost of repair.") (citing *2 Fat Guys Inv., Inc. v. Klaver*, 928 S.W.2d 268, 273 (Tex. App.—San Antonio 1996, no writ) ("In order to establish that repairs and expenses are reasonable and necessary, it is not imperative that the actual terms 'reasonable' and 'necessary' be used. Instead, the damaged party is only required to present evidence of damages sufficient and competent enough to justify the jury's conclusion that the costs are in fact reasonable and necessary." (internal citations omitted))).

As we have noted earlier, Robert was not a party to the real-estate contract at issue. As such, we agree with the Steeles that, in the absence of a contract between the Goddards and Robert, there is nothing to rescind with respect to Robert. *See Emmons v. Durable Mobile Homes, Inc.*, 521 S.W.2d 153, 154 (Tex. Civ. App.—Dallas 1974, writ ref'd n.r.e.) ("It is obvious that in the absence of a contract there can be no action for rescission." (quoting *S. Methodist Univ. v. Evans*, 131 Tex. 333, 115 S.W.2d 622, 624 (1938))); *see also Carrow v. Bayliner Marine Corp.*, 781 S.W.2d 691, 696 (Tex. App.—Austin 1989, no writ) ("[W]hen there is no privity of contract between a buyer and a seller, there is nothing to rescind, and there is no basis for rescission or restitution.").

With regard to Daniel, the Steeles, relying on *Cruz v. Andrews Restoration, Inc.*, assert that rescission is improper because the Goddards sustained no damages. 364 S.W.3d 817, 823 (Tex. 2012) ("Even a rescission award requires a showing of actual damages."). However, we have already rejected the Steeles' argument that Tyson's testimony conclusively disproved damages. We therefore reject the Steeles' assertion that rescission is improper because the Goddards sustained no damages.

In the alternative, the Steeles complain that the judgment awards rescission without any underlying jury findings. In making this argument, the Steeles do not cite to authority requiring a jury finding on the issue of rescission. Moreover, the Steeles do not address section 17.50(b)(3)-(4), which provides that the trial court may restore to any party to the suit the money or property illegally acquired or award any other relief which the trial court deems proper. *See* TEX. BUS. & COM. CODE ANN. § 17.50(b)(3)-(4); *Cruz*, 364 S.W.3d at 824 ("The DTPA authorizes trial courts to restore to any party to the

suit the money or property illegally acquired. . . . Several courts of appeals (including the court of appeals in this case) have held that this remedy incorporates the common law of rescission." (internal citations omitted)).

Based on the foregoing, we overrule the Steeles' third issue pertaining to rescission of the real-estate contract.

### 4. Other issues with the damages award

In their fourth issue, the Steeles argue that the judgment: (1) improperly assesses the total amount of damages against each defendant; (2) permits a double recovery; and (3) contains no election of remedies.

In their first sub-issue, the Steeles take issue with the following language contained in the judgment: "IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that plaintiffs have and recover $464,187.82 from defendants . . . ." According to the Steeles, this language implies that both Robert and Daniel are equally responsible for the total damage award despite a proportionate-responsibility finding of 60% for Robert and 40% for Daniel and different findings pertaining to "additional damages." Earlier, we concluded that the evidence supporting liability against Robert is insufficient and, thus, reversed all damages attributable to Robert. As such, we believe that the Steeles' complaint in this sub-issue has been rectified.

In their second sub-issue, the Steeles contend that the judgment permits a double recovery. Specifically, the Steeles argue that: "To award the Goddards their entire purchase amount, and then award them portions of that purchase price again, amounts to an impermissible double recovery." According to the Steeles, the judgment

improperly awarded the Goddards: "$77,019.94 in market value difference, then another $77,019.94 for rescission, and then another $24,202.22 for amounts paid toward purchase. The Goddards get all their money back; then they get all their money back again; then they get back all the money they paid so far."

At the outset of our analysis of this sub-issue, we note that the Goddards filed a motion to remit $77,019.94 of the actual damages, plus $7,860.25 in pre-judgment interest in the trial court. Given that the judgment awards the Goddards $103,722.16 in actual damages, which included $77,019.94 in actual damages, plus an additional $77,019.94, we agree that the judgment provides the Goddards with a double recovery.

If we determine that part of a damages award lacks sufficient evidentiary support, our proper course is to suggest a remittitur of that part of the damages. *See Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); *see also Hannon, Inc. v. Scott*, No. 02-10-00012-CV, 2011 Tex. App. LEXIS 3624, at *30 (Tex. App.—Fort Worth May 12, 2011, pet. denied) (mem. op.). The party prevailing in the trial court should be given the option of accepting the remittitur or having the cause remanded. *See Larson*, 730 S.W.2d at 641. Because we have concluded that the judgment provides the Goddards with a double recovery, we suggest a remittitur in the amount of $77,019.94, plus $7,860.25 in pre-judgment interest. The suggested remittitur mirrors the remittitur that was filed, but not granted, in the trial court.

Despite the remittitur, the Steeles also argue that a consumer may not receive both a restoration of money and economic damages, or in other words, the Goddards cannot receive $77,019.94 in damages associated with rescission of the real-estate

contract in addition to $24,202.22 awarded for money paid on the mortgage for the house and $2,500 awarded for repairs. In support of their contention, the Steeles rely heavily on the Texas Supreme Court's decision in *Ludt v. McCollum*, 762 S.W.2d 575 (Tex. 1988) (per curiam).

In *Ludt*, a homeowner sought to recover both repair costs and the permanent reduction in the market value of his house based on a builder's failure to disclose foundation problems associated with the house. *Id.* at 576. In rejecting Ludt's request to recover damages for the permanent reduction in the market value of the house after repairs, the Court mentioned that:

> In the present case, Ludt chose not to submit an issue as to permanent reduction in market value subsequent to the accomplishment of repairs. The issue that was submitted merely stated, "permanent reduction in the market value at the present time of the home because of foundation problems." At the time of trial, the repairs had not been made.
>
> We hold that plaintiff failed to submit and obtain a jury finding sufficient to establish the permanent reduction in market value after repairs.

*Id.*

Nevertheless, despite this holding, we fail to see how the *Ludt* holding bars the jury from awarding the Goddards damages for repair costs and the reduction in the market value of the house.[9] In fact, the *Ludt* Court stated the following:

---

[9] We also find the *Ludt* case to be distinguishable from the case at bar, especially considering that Ludt attempted to recover for repairs that had not been made at the time of trial, whereas the Goddards recovered for repairs that had already been made. *See Ludt v. McCollum*, 762 S.W.2d 575, 576 (Tex. 1988) (per curiam). Moreover, in the instant case, Tyson testified to the market value of the house after the repairs were made, which comports with the *Terminix* case referenced by the *Ludt* Court. *See id.* (citing *Terminix Int'l, Inc. v. Lucci*, 670 S.W.2d 657 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.)).

In Texas, courts have held that an aggrieved consumer may be able to plead, prove[,] and obtain favorable jury findings establishing both costs to repair and permanent reduction in market value notwithstanding such repairs, as cumulative rather than mutually exclusive measures of damage. *Brighton Homes, Inc. v. McAdams*, 737 S.W.2d 340 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.)[;] *Terminix [Int'l], Inc. v. Lucci*, 670 S.W.2d 657 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.). In *Terminix*, the court determined that an award of diminished value is recoverable in addition to the costs of repair, assuming that the permanent reduction in value refers to that reduction occurring even after repairs are made.

The *Ludt* Court also noted that:

We affirm the court of appeals decision, but observe that it would have been possible for Ludt to recover both measures of damages if he had requested issues that would have made it clear that he was asking for the amount of reduction in value after the repairs were made.

*Id.*

In addition, Texas courts have noted that rescission "is an equitable remedy and, as a general rule, the measure of damage is the return of the consideration paid, together with such further special damage or expense as may have been reasonably incurred by the party wronged on account of the contract." *Smith v. Nat'l Resort Communities, Inc.*, 585 S.W.2d 655, 660 (Tex. 1979); *see City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 732 (Tex. App.—Fort Worth 2008, pet. dism'd); *see also Hannon*, 2011 Tex. App. LEXIS 3624, at **26-27 ("Rescission is an equitable remedy that extinguishes legally valid contracts that must be set aside because of, among other things, fraud. Upon rescission, the rights and liabilities of the parties are extinguished; any consideration paid is returned, together with such further special damage or

expense as may have been reasonably incurred by the party wronged; and the parties are restored to their respective positions as if no contract had ever existed.").

In a more recent DTPA case, the *Cruz* Court also noted that "'[r]escission is one of the principal asset-based remedies in restitution,' and it 'restore[s] the parties to the status quo ante by unwinding the contractual exchange instead of pressing it forward." 364 S.W.3d at 825 (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 37 cmt. a). And finally, we note that section 17.50(b)(3) authorizes the equitable remedy of rescission and restoration, pursuant to which a consumer may recover all consideration paid for the defective product. TEX. BUS. & COM. CODE ANN. § 17.50(b)(3); *see Cruz*, 364 S.W.3d at 824 n.7; *Thomas v. State*, 226 S.W.3d 697, 710 (Tex. App.—Corpus Christi 2007, pet. dism'd).

Therefore, based on the foregoing authority, we cannot conclude that because the Goddards were awarded $77,019.94 for rescission, they were barred from recovering the consideration paid—$24,202.22 in mortgage payments—and $2,500 for repairs associated with the house. These damages, in addition with the extinguishment of the real-estate contract, returned the parties to the status quo ante. *See* TEX. BUS. & COM. CODE ANN. § 17.50(b)(3); *Cruz*, 364 S.W.3d at 824 n.7; *Smith*, 585 S.W.2d at 660; *City of The Colony*, 272 S.W.3d at 732; *Thomas*, 226 S.W.3d at 710; *see also Hannon*, 2011 Tex. App. LEXIS 3624, at **26-27.

In their third sub-issue, the Steeles complain that the judgment does not contain an election of remedies. In making this argument, the Steeles allege, without citing to the record, that the Goddards stated that they were electing recovery under the DTPA,

rather than under common-law fraud and negligence. After combing through the record, we find that the Goddards did, indeed, elect to recover solely under the DTPA in their post-verdict response filed on September 7, 2011. *See City of Glenn Heights v. Sheffield Dev. Co.*, 55 S.W.3d 158, 165 (Tex. App.—Dallas 2001, pet. denied); *see also Krobar Drilling, L.L.C. v. Ormiston*, No. 01-10-01016-CV, 2012 Tex. App. LEXIS 3478, at *10 (Tex. App.—Houston [1st Dist.] May 3, 2012, pet. denied) ("An election of remedies is the act of choosing between two or more inconsistent but coexistent modes of procedure and relief allowed by law on the same state of facts. When a party thus chooses to exercise one of them[,] he abandons his right to exercise the other remedy and is precluded from resorting to it."). Accordingly, we modify the judgment to reflect the Goddards' election of recovery under the DTPA.

In addition, the Steeles do not cite to, nor are we aware of, authority requiring the Goddards to elect under which provision of the DTPA—section 17.50(a)(1) or section 17.50(a)(3)—they seek to recover. As such, we reject that portion of the Steeles' election-of-remedies complaint in this sub-issue.

Based on the foregoing, we sustain the Steeles' fourth issue, in part.

**5.      Attorney's Fees**

In their final issue, the Steeles challenge the award of attorney's fees to the Goddards, arguing that the attorney's fees award is improper because the Goddards sustained no damages.

Section 17.50(d) of the Texas Business and Commerce Code mandates that each consumer who prevails shall be awarded court costs and reasonable and necessary

attorney's fees. TEX. BUS. & COM. CODE ANN. § 17.50(d). The Steeles do not argue that the amount of attorney's fees is unreasonable or unnecessary; instead, they premise their attorney's fee argument on the fact that the evidence is insufficient to support the award of any damages to the Goddards—a contention that we have previously rejected. Because we have concluded that the evidence is sufficient to support some of the damages awarded to the Goddards, and because section 17.50(d) mandates the award of attorney's fees to a prevailing consumer under the DTPA, we affirm the portion of the judgment awarding $75,000 in attorney's fees to the Goddards. *See id.*; *see also Davila*, 133 S.W.3d at 718. We overrule the Steeles' fifth issue.

## VI. CONCLUSION

In accordance with Texas Rule of Appellate Procedure 46.3, we suggest a remittitur in the amount of $77,019.94, plus $7,860.25 in pre-judgment interest. *See* TEX. R. APP. P. 46.3; *see also Hannon*, 2011 Tex. App. LEXIS 3624, at *31 (citing *Mahon v. Caldwell, Haddad, Skaggs, Inc.*, 783 S.W.2d 769, 772 (Tex. Civ. App.—Fort Worth 1990, no writ)). If the Goddards file in this Court within fifteen days of this memorandum opinion, a remittitur of $77,019.94, plus $7,860.25 in pre-judgment interest, then our subsequent judgment will modify the trial court's judgment in accordance with the remittitur and, as modified, affirm that judgment as to Daniel. *See Mahon*, 783 S.W.2d at 772; *see also Hannon*, 2011 Tex. App. LEXIS 3624, at *31. If the suggested remittitur is not filed, we shall reverse the trial court's judgment and remand this entire cause to the trial court for a new trial. *See Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007); *see also Downing v. Burns*, 348 S.W.3d 415, 427-28 (Tex. App.—Houston [14th Dist.] 2011, no

pet.) (noting that a separate trial on unliquidated damages cannot be ordered when liability is contested (citing TEX. R. APP. P. 44.1(b))).

In addition, we reverse and render judgment in favor of Robert; therefore, all damages assessed against Robert are deleted from the judgment. Furthermore, we modify the judgment to reflect the Goddards' election of recovery under the DTPA. In all other respects, we affirm the trial court's judgment.


AL SCOGGINS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
(Chief Justice Gray dissents. A separate opinion will not issue.)*
Affirmed, in part, and reversed and rendered, in part, and modified, in part,
conditioned on remittitur
Opinion delivered and filed June 13, 2013
[CV06]