# IN THE SUPREME COURT OF TEXAS

════════════
No. 12-0728
════════════

IN THE INTEREST OF K.M.L., A CHILD

════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS
════════════════════════════════════════════════

JUSTICE JOHNSON, joined by JUSTICE BOYD, dissenting in part.

I respectfully dissent from Part II.B. of the Court's opinion in which it holds the evidence is legally insufficient to support the jury finding that Melissa knowingly and intelligently relinquished her parental rights. Except for Parts II.B., II.D., and IV, I join the Court's opinion. I join its judgment as to John. I dissent from the judgment as to Melissa.

In determining legal sufficiency of the evidence to support a jury finding, whether the burden to obtain the finding is by a preponderance of the evidence or by clear and convincing evidence, we must credit the evidence supporting the finding if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so. *Ante* at ___; *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 819 (Tex. 2012); *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009). Reviewing the evidence as to Melissa under that standard compels the conclusion that the Court errs in failing to affirm the judgment of the lower court as to her.

In concluding that the evidence is legally insufficient to support the jury finding as to the relinquishment affidavit, the Court says that "[t]here is absolutely no evidence in the record other than the language of the affidavit itself that on June 4, 2010, Melissa understood the consequences of signing the affidavit—that she would be permanently and irrevocably severing her relationship with her daughter and handing over custody to DFPS, not her mother, with no guarantees that she would ever see her daughter again." *Ante at ___*. I disagree with that statement, but also disagree with the Court's conclusion that the evidence is legally insufficient for another, more basic, reason. First, even if the affidavit is the only evidence, it is legally sufficient evidence to support the jury finding. Next, despite the Court's conclusion, the record contains other evidence that is legally sufficient to do so, especially when considered along with the relinquishment affidavit.

First, as to the June affidavit, the trial court overruled Melissa's challenge to its validity and her objection to its admission into evidence. The Court overrules her challenge to that ruling, thus the affidavit is evidence the jury could have considered for all purposes. As the sole judges of the credibility and weight of the evidence, the jurors could have credited the affidavit and its clear relinquishment language and disregarded the testimony and evidence supporting Melissa's claim that she did not know what she was doing by executing the affidavit. And the Court must disregard the evidence supporting her claim as well, because the jury could have disbelieved Melissa's testimony as an interested witness and given less weight to her other evidence regarding the affidavit. Certainly, Melissa's evidence that she was unaware of what she was doing, including the evidence that she was intellectually disabled and bipolar, does not completely negate the evidentiary value of

2

the affidavit. As the jury was both entitled and required to do, it resolved the conflicts in the evidence and found that Melissa voluntarily and intelligently executed the affidavit.

Next, the Court's statement that there is "absolutely no evidence" to support the jury finding other than the language of the affidavit itself ignores significant record evidence and inferences raised by that evidence. *See ante at ___*. When Melissa executed the June affidavit, she was, and had been since August 9, 2009, represented by Joe Roth, a court-appointed attorney. Roth began practicing law in 1977 and had a general practice which for many years included representing parents and children in termination cases. Roth signed as one of two statutorily required witnesses to Melissa's execution of the June affidavit. Melissa testified that Roth did not go over the affidavit with her. Roth testified at trial, but was precluded by trial court rulings from testifying about his communications with Melissa. But Amanda Jackson, the Department's conservatorship supervisor for Melissa's case, testified regarding the events surrounding Melissa's execution of the affidavit, and her testimony included some of Roth's interactions with Melissa:

> The day that [Melissa] signed the affidavit of relinquishment with -- Joe Roth was still appointed to be her attorney. It was the first Friday of June . . . and that day Melissa had arrived, and she came into the courtroom downstairs, and I was sitting at one of the tables, and she came up to me and asked if she could talk to me, and I said yes. And she said what do I have to do to sign my -- to sign my rights over. And I told her that I did not feel comfortable discussing that with her because it is not proper for [the Department] to discuss relinquishment with parents when they are represented by an attorney. So, I explained to Melissa that I did not feel comfortable discussing that with her. I told her that Mr. Roth should be there shortly, and that I would relay what she was saying to him, and that was something they would need to discuss, because I could not discuss that with her.

When asked if Melissa asked any questions regarding relinquishing her rights, Jackson testified:

3

She just -- she just asked, you know, about the paperwork. She came up to me after she had signed it with Mr. Roth. When Mr. Roth arrived, I saw the two of them, you know, talking off to the side. He came over to me. I told him what his client had said. I provided him with relinquishment paperwork that is prepared by our legal department. I gave him that paperwork. . . . He went outside. He was outside on the bench with Melissa. I don't know, particularly, what they were discussing, but he sat down with her. And then he came back and said she wants to sign.

Counselor Miller, who began counseling Melissa in November 2009 and continued doing so until several months after Melissa executed the June affidavit, testified that she and Melissa "talked about relinquishment [of Melissa's parental rights] over a number of sessions." Part of her testimony focused specifically on her counseling of Melissa in March, May, and June 2010, when Melissa signed the June relinquishment affidavit as well as two earlier ones that Miller did not know about. Miller's last counseling session with Melissa before she executed the June affidavit was on June 1, 2010, three days before Melissa executed the affidavit on June 4. Miller's testimony about Melissa's understanding of what relinquishing her parental rights meant included the following exchange:

Q: Now, do you have an opinion as to whether or not she did this voluntarily?
A: As far as relinquishing her rights?
Q: Yes.
A: We spent a number of sessions talking about it. I felt like it was my job to help her look at the pros and cons, not to lead her to any certain direction, and she appeared to be able to weigh those pros and cons. And the last session I had, she was leaning towards relinquishing her rights, and she seemed to have a good grasp on that. She didn't seem to be confused.
. . .
Q: Do you think that she had a -- do you think that she knew what she was doing in exercising these three affidavits of relinquishment?
A: Well, I know when I worked with her, I was very careful to make sure that the words I used weren't too big, or I would let her know that if I said something and she didn't understand to stop me. I wanted to make sure she understood. That's why I felt like, counseling-wise, that she had a good grasp of what we talked about. I

4

wasn't there during the hearing. It seems like -- I recall her saying at the hearing she couldn't hear some of what was going on and she had a hard time following the court proceedings sometimes, as far as the words she didn't understand.

Q: But from her talking with you over and over again about relinquishing, do you think that she had a firm grasp on what the pros and cons were?

A: Yes, from the other therapy sessions.

. . .

Q: And so Melissa did have plans, you know, for her future; is that correct?

A: I wouldn't say that she had her life mapped out, but she appeared to me that she was very bonded with her child.... And I explained to her if her rights were terminated, that that would mean she would have no contact with her child until possibly the child was 18.

To give context to Miller's testimony, it is important to note first that she was not a Department employee, and second, her qualifications. Miller was licensed as a professional counselor in 1996 and began practicing as a counselor that same year. Before she was licensed as a counselor she earned Bachelors and Masters degrees. Her Masters degree was in Psychology and included training in psychological, IQ, and achievement testing. As part of her counseling practice she performed "a high volume" of that type of testing until 2009, as well as performing tests for disabilities including intellectual disabilities.

As noted above, the June affidavit of relinquishment was not Melissa's first encounter with the concept of relinquishing her parental rights. She executed two earlier affidavits in which she also stated that she relinquished her rights, the first being on March 15, 2010. That affidavit was entitled Request for Termination of Parental Rights Pursuant to Voluntary Parental Relinquishment, and was prepared and notarized by the attorney representing her mother. By its language Melissa relinquished her parental rights, requested that they be permanently and irrevocably terminated, requested that her mother, Angali, be designated as KML's conservator, *and acknowledged that*

*termination of her rights would not be dependent on Angali being granted conservatorship.* The document contained the statement "I swear that the statements contained in this document are based on personal knowledge, are true and correct, [and] are made under oath in front of a notary."

Then, on May 5, 2010, she executed a document entitled Affidavit of Voluntary Relinquishment of Parental Rights. That document, like the March 15 document, was prepared by Angali's attorney. Two persons signed that document as witnesses and it was notarized by a deputy district clerk for San Jacinto County. In that document Melissa stated that she had been informed of her parental rights and duties, termination of her rights was in the best interest of KML, and the relinquishment was irrevocable. Both of those documents were admitted into evidence at trial.

Angali's attorney, who prepared the March and May relinquishment documents, testified that he prepared the documents based on Melissa's verbal statements and that he believed her purpose in executing them was to allow Angali to become the "adoptive parent or managing conservator of" KML. The documents were both notarized and Angali's lawyer personally notarized one of them. The attorney testified that Melissa signed the documents in front of him, but he did not think she read them. He testified, however, as follows regarding whether he explained the effect of the relinquishment documents:

> Q: And you didn't read or explain it to her at all; is that correct?
> A: I did some explanation. I don't think I read it to her.
> . . .
> Q: Did you feel any sort of obligation to tell her that she needed to read it or ask her any questions with regard to her being sure that that's something she wanted to do?
> A: I think I did some of that.
> Q: Give us an example of what you did.
> A: Okay. What this document is going to do, it's going to terminate your rights, because that has to happen in order for your Momma here, in the next room, in order

to adopt. You can't just have multiple people that are parents of a child. So what we're going to do here is terminate -- this is going to terminate your rights in order to allow your mother to have the child.

Q: So you explained what termination was to her, and kind of how the process would work?

A: *I didn't tell her anything about the process, but I think I explained to her that this was a termination, yeah, termination.*

Q: *Do you think she understood it? At the time, did you think she understood it?*

A: *I did think at the time she understood it. I believe that.* (emphasis added)

There is evidence that Melissa, at the time she executed the June affidavit, was intellectually disabled and bipolar and that she did not understand what she was doing when she signed it. But when presented with substantial direct evidence—including the affidavit itself—and evidence from which logical inferences could be drawn to the effect that she did knowingly and intelligently execute the affidavit, the jury could have disregarded the conflicting evidence that supported Melissa's claim that she did not understand what she was doing. The evidence supporting the jury finding includes, but is not limited to, the witnessed, notarized affidavit itself; her execution of two prior notarized affidavits relinquishing her parental rights, one of which was witnessed by two unimpeached witnesses and notarized by a court clerk; the explanation to Melissa by her mother's attorney in connection with at least one of the prior affidavits about what relinquishment meant; her receipt of professional counseling specifically directed in part to helping Melissa understand the effect of relinquishing her parental rights; and opinion testimony by both Angali's attorney and Melissa's counselor that Melissa understood what relinquishing her parental rights meant.

I would affirm the judgment of the court of appeals as to Melissa.

_____

Phil Johnson
Justice

**OPINION DELIVERED:** August 29, 2014