**Reversed and Rendered and Memorandum Opinion filed September 17, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-14-00196-CV

**ENTRUST, INC., Appellant**

**V.**

**RICE DISTRICT COMMUNITY HOSPITAL
D/B/A RICE MEDICAL CENTER, Appellee**

**On Appeal from the 25th District Court
Colorado County, Texas
Trial Court Cause No. 22,763**

## M E M O R A N D U M   O P I N I O N

Entrust, Inc. appeals from a money judgment against it and in favor of Rice District Community Hospital d/b/a Rice Medical Center following a jury trial on Rice's claim under the Deceptive Trade Practices-Consumer Protection Act (DTPA). *See* Tex. Bus. & Com. Code §§ 17.41-.63 (Vernon 2011 & Supp. 2014). We reverse the trial court's judgment and render a take-nothing judgment in favor

of Entrust because this record contains no evidence that Rice relied to its detriment on the representations upon which Rice predicated its DTPA claim.

## BACKGROUND

Entrust contracted with Rice in 2006 to administer Rice's self-funded employee health benefit plan for Rice's employees. Under the plan, Rice funded a designated trust account to pay health care claims up to $35,000 submitted by its employees. Rice obtained stop-loss insurance from Pan American Life Insurance to cover employee health care claims exceeding $35,000.

Entrust established and operated Rice's health benefit plan, processed claims, and submitted claims exceeding $35,000 to the stop-loss insurer. Entrust and Rice renewed their contract in 2007, 2008, and 2009. Rice procured stop-loss insurance from Pan American during this period.

Section 1(E) of the Entrust-Rice contract obligated Entrust to "receive and review claims for benefits under the Plan and . . . use its best efforts, consistent with industry standards to compute the benefits payable, if any, in accordance with the terms and conditions of the Plan." This provision also states: "Entrust will complete its review of all claims after complete proof of claims is received by Entrust in accordance with applicable laws and regulations." It concludes: "On no account can Entrust, or any employee or owner of Entrust, guarantee processing of claims earlier than the 10th day after the date on which valid proof of loss is received by Entrust."

Section 1(H) addresses stop-loss insurance and states: "If the Client has obtained stop loss insurance coverage for funding Plan benefits in excess of certain specified individual and aggregate limits, Entrust shall assist the Client in the submission of claims for benefits payable under such coverage." This provision

2

continues: "Entrust shall not be required to process claims for benefits under the Plan other than in the ordinary course of claim processing duties and no priority will be given to claims merely because the stop loss year is coming to a close."

Section 9 of the Entrust-Rice contract states as follows: "Either party shall have the right to renegotiate or terminate this Contract by giving to the other party valid and timely notice clearly indicating intent to renegotiate or terminate the terms of this Contract."

While the contract was in effect, Entrust received from Methodist Hospital, in May 2009, a one-page summary of medical expenses totaling $157,666.50 incurred for inpatient treatment of a Rice employee provided during April and May 2009. Entrust requested further information to establish a complete proof of claim; among other things, Entrust asked Methodist to provide an itemized bill, invoices, and medical records so that Entrust could process the claim. Entrust denied the claim on August 4, 2009, after it failed to receive the requested proof of claim information from Methodist.

In late October 2009, Entrust representatives met with Rice to discuss renewing their contract. Rice initially indicated on October 19, 2009, that it would renew its contract with Entrust and its stop-loss insurance policy with Pan American.

Rice notified Entrust on November 25, 2009, that it was cancelling the contract with Entrust. In its cancellation letter, Rice stated: "As you are aware, the board of Rice Medical Center has agreed to turn over the operations of the hospital to Critical Access Healthcare, and as such, the hospital district will no longer have any employees. CAH has decided to use another insurance agency for their healthcare needs." The letter further states: "The effective date of the new health insurance will be December 1."

Rice did not pay the invoices Entrust sent to Rice for November and December stop-loss insurance premiums; therefore, Rice's stop-loss coverage from Pan American for claims exceeding $35,000 terminated on October 31, 2009. Former Rice CEO Richard Hoeth testified that Rice was unaware of the $157,666.50 Methodist bill when Rice allowed its stop-loss coverage to terminate, and that Entrust had not alerted Rice to the bill's existence before termination of the stop-loss coverage.

Entrust received the requested billing detail, invoices, and medical records from Methodist for the previously submitted $157,666.50 claim by November 6, 2009. Rice no longer had stop-loss coverage in place at this time for amounts above $35,000. Entrust finished processing the Methodist bill on November 24, 2009; determined that $94,559.90 properly was payable to Methodist after certain agreed discounts were applied to the charges; drafted a check payable to Methodist in that amount drawn on Rice's health plan trust account; and asked Rice to deposit funds in the trust account sufficient to cover the Methodist check. Hoeth testified that Rice paid $35,000 and some additional charges, leaving a remaining balance owed to Methodist of $58,915.40.

Rice contended that Entrust was liable to Rice for the remaining $58,915.40 balance due to Methodist and sued Entrust for breach of contract, fraud, slander, and various alleged violations of the Texas Insurance Code and DTPA. The case proceeded to a jury trial on October 28, 2013.

The jury answered "yes" to Question No. 1 in the charge, which stated as follows:

> Did the party named below engage in any false, misleading, or deceptive act or practice that Rice District Community Hospital, d/b/a Rice Medical Center, a Political Subdivision of the State of Texas relied on to its detriment and that was a producing cause of damages

4

to Rice District Community Hospital, d/b/a Rice Medical Center, a Political Subdivision of the State of Texas?

'Producing cause' means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing ca[u]se.

'False, misleading, or deceptive act or practice' means any of the following:

(a) Representing that services had or would have characteristics that they did not have; or

(b) Representing that services are or will be of a particular quality if they were of another; or

(c) Representing that an agreement confers or involves rights that it did not have or involve.

Answer "yes" or "no" for the following:

Entrust, Inc.          Yes

The charge's subparts defining "false, misleading, or deceptive act or practice" correspond to sections 17.46(b)(5), (7), and (12) of the DTPA.

In response to Question No. 6, which was predicated on a "yes" answer to Question No. 1, the jury awarded $58,915.40 as damages to Rice representing "[t]he amount Rice Medical Center is obligated to pay, and will pay, to settle the Methodist Hospital claim." The jury awarded $134,039.20 in attorney's fees to Rice in response to Question No. 8, which also was predicated on a "yes" answer to Question No. 1.

The jury answered "no" to additional questions in the charge asking whether Entrust engaged in any unconscionable action or course of action; acted knowingly; committed fraud; and failed to comply with section 1(E) of the Entrust-Rice contract.

The trial court signed a final judgment on December 3, 2013, awarding

damages and attorney's fees to Rice in conformity with the jury's verdict. Entrust filed a motion to disregard the adverse jury answers on January 2, 2014. Entrust asked the trial court to disregard the jury's answers to Questions Nos. 1 and 6 on grounds that they are not supported by legally sufficient evidence; it also asked the trial court to disregard the jury's answer to Question No. 8 on grounds that attorney's fees cannot stand once the jury's answers to Questions Nos. 1 and 6 are disregarded. The trial court denied Entrust's motion after a hearing on January 23, 2014. Entrust now challenges the trial court's final judgment on appeal.

## ANALYSIS

Entrust contends in two issues that the trial court erred in denying its motion for directed verdict and its post-trial motion to disregard the jury's answers to Questions Nos. 1 and 6 because no legally sufficient evidence supports these answers.

Before addressing Entrust's issues, we first address Rice's contention that this court lacks subject matter jurisdiction because Entrust filed its notice of appeal late.

## I. Appellate Jurisdiction

The trial court signed its final judgment on December 3, 2013, awarding damages to Rice. Entrust timely filed a motion to disregard certain of the jury's answers under Texas Rule of Civil Procedure 301 on January 2, 2014; among other things, Entrust asked the trial court to modify the December 3, 2013 money judgment in Rice's favor by signing a take-nothing judgment in Entrust's favor after disregarding the jury's answers to Questions Nos. 1 and 6. This motion operated as a motion to modify, correct or reform the judgment under Texas Rule of Civil Procedure 329b and extended the deadline for Entrust to file its notice of

6

appeal until March 3, 2014. *See Ryland Enter., Inc. v. Weatherspoon*, 355 S.W.3d 664, 666-67 (Tex. 2011) (per curiam); *see also* Tex. R. App. P. 26.1(a)(2). Entrust's notice of appeal is file-stamped March 5, 2014; the certificate of service is dated March 4, 2014.

Rice asserts that Entrust did not perfect its appeal within 90 days of the date on which the trial court signed its judgment because Entrust's notice of appeal "reflects that it was first <u>created</u> by Entrust on March 4, 2014, making it impossible to argue that it was mailed prior to March 3, 2014, the final due date." Entrust contends that the notice of appeal was timely filed by mail on March 3, 2014.

Texas Rule of Appellate Procedure 26.3 allows an extension for a notice of appeal filed in the trial court within 15 days of the deadline. A motion for extension of time is "necessarily implied" when the perfecting instrument is filed within 15 days of its due date. *Verburgt v. Dorner,* 959 S.W.2d 615, 617 (Tex. 1997). Even when a motion for extension is implied under *Verburgt*, the appellant still must proffer a reasonable explanation of the need for an extension. *See Jones v. City of Houston*, 976 S.W.2d 676, 677 (Tex. 1998); *Miller v. Greenpark Surgery Ctr. Assocs., Ltd.*, 974 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1998, no pet.).

Based on the March 5 file stamp, Entrust's notice of appeal was filed within 15 days of the March 3 deadline so that a motion for extension is implied under *Verburgt*. Entrust filed a brief in support of its implied motion for extension of time in this court supported by an affidavit signed by Entrust's counsel. According to this affidavit, counsel deposited the notice of appeal in the United States Mail with proper postage on March 3 and faxed a copy of the notice to Rice's counsel on the same day. The affidavit states: "The certificate of service attached to the Notice of Appeal erroneously states that the Notice of Appeal was served to

7

counsel for Rice Medical Center on March 4, 2014. This was a typographical error." This filing suffices as a reasonable explanation of the need for an extension. *See Ryland Enter., Inc.*, 335 S.W.3d at 665 ("This Court has consistently treated minor procedural mishaps with leniency, preserving the right to appeal. . . . We summed up this principle of leniency in *Verburgt* with the rule that 'appellate courts should not dismiss an appeal for a procedural defect whenever any arguable interpretation of the Rules of Appellate Procedure would preserve the appeal.'") (quoting *Verburgt*, 959 S.W.2d at 616).

The notice of appeal is effective and this court has appellate jurisdiction. Accordingly, we overrule Rice's jurisdictional challenge.

## II.    Legal-Sufficiency Analysis

### A.    Standard of Review

Entrust argues that the trial court should have granted a directed verdict, granted its post-trial motion, and signed a take-nothing judgment because there is no evidence to support the jury's "Yes" answer to Question No. 1 submitting three specific types of representations under DTPA section 17.46(b).

A directed verdict is proper when no evidence of probative force raises a fact issue on a material element of the plaintiff's claim, or when the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex. 2000). A trial court may disregard a jury verdict and render judgment notwithstanding the verdict when no evidence supports the jury finding on an issue necessary to liability, or when a directed verdict would have been proper. *Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex. 2003); *see* Tex. R. Civ. P. 301.

"No evidence" or legal-insufficiency challenges may be sustained only when

8

the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960)).

We must consider evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id.* at 822. If the evidence allows only one inference, neither jurors nor the reviewing court may disregard that evidence. *Id.* If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Id.* The reviewing court cannot substitute its judgment for that of the trier of fact if the evidence falls within this zone of reasonable disagreement. *Id.*

## B. Application of Standard of Review

Rice initially asserted claims under several DTPA provisions. By the time the jury was charged, however, the scope of Rice's DTPA claims had been narrowed so that Question No. 1 limited the definition of "false, misleading, or deceptive act or practice" to representations by Entrust that

- "services had or would have characteristics they did not have;"

- "services are or will be of a particular quality if they were of another;" or

- "an agreement confers or involves rights that it did not have or involve."

*See* Tex. Bus. & Com. Code §§ 17.46(b)(5), (7), (12). Based on Question No. 1 as

submitted and DTPA section 17.50(a)(1)(B), Rice had to establish detrimental reliance on at least one of these representations to recover under section 17.46. *See, e.g.*, *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 823 (Tex. 2012).

Entrust argues that the jury's "Yes" answer to Question No. 1 should be disregarded because Rice failed to proffer legally sufficient evidence of a representation by Entrust that was a precise, extra-contractual, false statement of fact made before Rice's alleged injury and upon which Rice relied to its detriment.

Rice contends that it presented legally sufficient evidence because Entrust made numerous representations to Rice before execution of the Entrust-Rice contract, after execution, while the contract was in full force and effect, and shortly after the contract was terminated. Rice contends that DTPA sections 17.46(b)(5), (7), and (12) "apply where there is evidence of a representation outside a contract that expresses to the customer that an agreement confers or involves rights, remedies, or obligations which it does not have or involve or which are prohibited by law."

Rice argues that Entrust made representations (1) "to the effect that Entrust would 'take care of' and be intimately involved in the role that the stop loss carrier would play in payment of losses above \$35,000;" and (2) on Entrust's website holding Entrust out to be an expert in the areas of selection, placement and operation of the right type of stop-loss coverage for each of its customers. According to Rice, trial testimony from Rice CEO Hoeth and DTPA expert Roy Phillips "provided the jury with evidence that the misrepresentations were of material facts, that they were false and were made prior to the date in November, 2009 when Rice was informed that it had lost its stop loss coverage with Panama [sic] Insurance Company leaving it responsible—after payment of its self-insured retention—for a \$58,915 medical bill owed to Methodist Hospital." Rice further

10

contends that Phillips and Hoeth "established that Rice *relied* on those representations to their [sic] detriment."

The only assertedly false representations identified at trial pertaining to the characteristics and quality of Entrust's services, or to rights conferred by the Entrust-Rice contract, came from Entrust's website. During his testimony, Rice's expert Phillips read aloud and at length from Entrust's website.

- "'Our mission at the Entrust family of companies is to achieve customer satisfaction with exceptional people to require performance that inspires, to demand even higher standards of care, to build a culture where aspirations, dreams, and visions are of free range, and where quality is the universal language. We are committed to excellence as consultants and administrators and the benefits in risk management business. We pledge to stay at the forefront of a constantly changing industry, these trends in order to provide the most flexible, cost effective solutions.'"

- "The web site [sic] holds Entrust out as a premier and employee benefit management group, and here's their statement from their own web site [sic]. 'Your benefits are our business. Located in Houston, Texas, with a full service office in Corpus, the Entrust family of companies is a premier employee benefit management group, and a proven plan administrator with the reputation of being one of the most innovative benefit designers in the business. The Company enjoys a rich history, and [is] well respected by its clients and competitors alike. Entrust has the experience system and resources to develop solutions for business challenges.'"

- "And then there's another statement on the web site [sic]. 'Let us help

11

you. Our administration of your benefit plans frees you from paperwork so you can focus on your business. From plan enrollment, to claims processing, employee communication to billing and reporting, Entrust can provide all of the services you need.'"

- "Paragraph; 'Our systems and highly professional staff are capable of administering even the most challenging programs, such as COBRA, and your compliance with the new health care and reform regulations. We can customize our level of service to your needs.'"

- "And then they went on to talk about stop-gap coverage. 'Stop-loss negotiations. Entrust partners with several preferred stop-loss carriers that understand how the Entrust sweep [sic] of signature products will positively affect the financial performance of the plan. By providing competitive rates and plan design considerations, Entrust is able to supplement claims, control costs with the added protection of stop-loss coverage in the event that catastrophic care is necessary for a member. When developing customized solutions for our client, Entrust will leverage our preferred relationships to obtain the most competitive rates available based on our experience. Our in-house underwriting experts model spending and plan design to best suit the needs and cost planning strategy for our client.'"

In a follow up question, Phillips was asked: "[W]hat representation did Entrust make in its web site [sic] that it would take care of?" Phillips responded: "Well, I read them to the Jury and the Judge, and I think it's pretty clear that they said that they were the best and the brightest and that they would do a good job for you as long as you pay them."

According to Rice's appellate brief, Phillips "established that Rice relied on

those representations" appearing on Entrust's website. Rice cites globally to the entirety of Phillips's 95-page direct and cross-examination at trial to support this assertion. A review of the cited testimony reveals no discussion by Phillips of Rice's reliance on statements on the Entrust website.

Former Rice CEO Hoeth also testified. He was asked, "What, in your opinion, is the real issue, what is the guts of this lawsuit against Entrust about?" Hoeth answered: "Well, as far as I'm concerned, the main issue here is the fact that one claim didn't get processed, and because of the transition, we were left without coverage there. So we were kind of twisting in the wind with that particular claim." A further question asked, "In general, what were you really relying on Entrust to do to take care of you and this self-insured program?" Hoeth said: "Well, basically we contracted with them to administer the program. We aren't insurance specialists, as you know insurance is a very complex business and so that's what we paid them to the tune of $20,000 a month for." Counsel later asked Hoeth: "Have you ever looked at . . . Entrust's web site?" Hoeth answered: "Na, not really. I think I might have glanced at it, just cursorily. I didn't really look at it in detail."

Even if it is assumed solely for argument's sake that all or some of the website content quoted by Phillips is actionable under DTPA sections 17.46(b)(5), (7), and (12), this record contains no evidence of Rice's detrimental reliance upon the asserted website representations as required under the jury charge and section 17.50(a)(1)(B). *See Garza v. Garza*, No. 04-11-00310-CV, 2013 WL 749727, at *7 (Tex. App.—San Antonio Feb. 27, 2013, no pet.) (mem. op.); *Baysystems N. Am. LLC v. Rosebud-Lott Indep. Sch. Dist.*, No. 10-08-00260-CV, 2011 WL 6989898, at *4 (Tex. App.—Waco Dec. 21, 2011, pet. denied) (mem. op.).

Rice highlights other portions of the record in an effort to demonstrate

13

evidence supporting the jury's "yes" answer to Question No. 1.

Phillips faulted Entrust for failing to alert Rice during contract renewal discussions – or at any other time before November 2009 – about the Methodist bill, which exceeded Rice's $35,000 threshold for seeking payment from the stop-loss insurer. He also faulted Entrust for not following up with Methodist more quickly and aggressively between May and November 2009 to obtain the additional information necessary to complete a proof of claim that would allow the bill to be processed for payment. According to Hoeth, Rice had been unaware of this bill and already had allowed its stop-loss insurance to terminate by the time Entrust forwarded the bill to Rice for payment in November 2009.

Additionally, Rice points to testimony from Hoeth and Brian Davidson, Entrust's former vice president of sales. This testimony focused on discussions between Hoeth and Davidson that occurred after Rice had terminated the Entrust-Rice contract and its stop-loss insurance, and after the Methodist bill had come to light. Hoeth testified that Davidson was "gloating over our misfortune" and hoping to use it as "leverage for saving" the Entrust-Rice contract by encouraging Rice to "reconsider our coverage." During his testimony, Davidson was asked: "Did you do a little arm twisting and say to them, '[H]ey, you've got a problem here, sorry, but if you change your mind, I probably can fix it.' Did you ever say anything like that to them?" Davidson answered: "I may have in order to keep the business with us." Another question asked: "And you don't think it would be a sharp business practice to say to Rice, '[S]tay with me, and I can go to that stop-loss carrier and make this all well?" Davidson answered: First of all, I could never make a promise like that. Second of all, I very well may have. I wanted to keep Rice's business."

Finally, Rice points to a letter dated December 15, 2009, from Entrust's

14

general counsel to Hoeth in which Entrust acknowledged receipt of Rice's November 25 letter terminating the Entrust-Rice contract. According to Rice, Entrust improperly used this "demand letter" to punish Rice for terminating the Entrust-Rice contract by making "threats of termination fees, penalties, and interest." Rice characterizes the letter as "part of the global scheme that Entrust put together to pressure Rice to keep its business at Entrust." Rice also argues, "An examination of the letter reflects the inconsistency between what is being said in the letter and what the contract provides for if and when a customer makes a decision to terminate its relationship with Entrust."

Phillips described the totality of Entrust's "business behavior" in his testimony as "totally unfair," "unethical," "illegal," and a "violation of the Texas Insurance Code . . . [and] the Texas Business and Commerce Code . . . ."

Insofar as this evidence addresses post-loss representations by Davidson and Entrust relating to coverage, it neither supports the jury's "yes" answer to Question No. 1 nor establishes reliance. *See Royal Globe Ins. Co. v. Bar Consultants*, 577 S.W.2d 688, 694-95 (Tex. 1979) (representations made after loss occurred did not constitute a deceptive trade act or practice; "there is no evidence that [the insured] . . . took any action based on the post-loss representation to its injury or damage"). Additionally, even if this evidence arguably demonstrates sharp practices germane to the charge questions on unconscionability, fraud, or breach of contract, the jury answered "no" to those questions and these unchallenged "no" answers provide no alternative basis for the judgment in Rice's favor awarding damages against Entrust. The only basis for an award of damages was the jury's "yes" answer to Question No. 1, which was confined to representations regarding the characteristics and quality of Entrust's services and the rights conferred under the Entrust-Rice contract. The non-website evidence highlighted by Rice does not

pertain to such representations and is legally insufficient to support the jury's "yes" answer to Question No. 1.

We sustain Entrust's first issue because no evidence supports the jury's "yes" answer to Question No. 1. Reversal of the judgment on this basis also requires reversal as to the damage award in response to Question No. 6 and the attorney's fee award in response to Question No. 8, both of which were predicated on a "yes" answer to Question No. 1.

## CONCLUSION

We reverse the trial court's judgment and render judgment that Rice District Community Hospital d/b/a Rice Medical Center take nothing on its claims against Entrust, Inc.


         /s/     William J. Boyce
                  Justice


Panel consists of Chief Justice Frost and Justices Boyce and McCally.

16